Hubert Wayne JOHNSON,
Plaintiff-Appellant,

v.

JOHN F. BEASLEY CONSTRUCTION
COMPANY, a Corporation,
Defendant-Appellee.

No. 83–3196.

United States Court of Appeals,
Seventh Circuit.

Argued April 3, 1984.

Decided Aug. 24, 1984.

Jay H. Janssen, Law Office of Jay H. Janssen, Peoria, Ill., for plaintiff-appellant.

Rex K. Linder, Mark D. Howard, Heyl, Royster, Voelker & Allen, Peoria, Ill., Manfred W. Leckszas, Ober, Kaler, Grimes & Shriver, Baltimore, Md., for defendant-appellee.

Before WOOD and CUDAHY, Circuit Judges, and NICHOLS, Senior Circuit Judge.[*]

HARLINGTON WOOD, Jr., Circuit Judge.

On July 13, 1981, appellant Hubert Johnson sustained injuries while working on a construction barge owned by appellee Beasley Construction Company ("Beasley"). Appellant sued Beasley under the Jones Act, 46 U.S.C. § 688, and Beasley moved for summary judgment on the ground that appellant was not a "seaman" as required under the Act. The district court granted Beasley's motion and entered judgment in its favor. We affirm.

I.

The facts are not in dispute. Beasley is a structural steel contractor. It was hired to remove the swing span portion of a railroad bridge over the Illinois River at

---

[*] The Honorable Philip Nichols, Jr., Senior Circuit Judge for the United States Court of Appeals for the Federal Circuit, is sitting by designation.

Pearl, Illinois, and to replace that span with a lift section to facilitate navigation in the river channel (the existing swing span rested on a pier-supported turntable that created an obstruction in the middle of the navigation channel). The lift section was to be raised by machinery situated in a control house set on concrete pedestals on the south side of the bridge. Because the navigation channel had to remain unobstructed during the time Beasley was constructing the lift section, the lift section had to be assembled on the west bank of the river on falsework downstream from the bridge crossing (the falsework consisted of towers made of steel braces set upon pilings that had been driven into the river bottom). Following construction of the lift section, it was to be floated into the gap left by the removal of the swing span and then hoisted into place for incorporation into the existing bridgework.

Appellant was a foreman in charge of a crew whose responsibilities were to construct the lift section and the control house. Because the work was to be performed over water, Beasley employed several barges and a tugboat. One of the barges, called the JFB–15, was a steel-decked floating work platform on which had been installed a large lifting crane. The JFB–15 measured 135 feet by 40 feet by 8 feet, and had a displacement of 405 tons. It had no motive power of its own and no steering capability, and was not equipped with cabins, galley, fresh water storage, permanent toilets, or fixed navigational lights. The workers on the JFB–15 were transported to and from the barge daily.

The primary role of the JFB–15 was to provide a site for the assembly of the control house and to assist in the construction of the lift section on top of the falsework. The JFB–15 was also used to transport iron to the work site. On these occasions, a tugboat would push the barge downstream to points where the supply trucks could get close enough to be reached with the crane. Appellant and his crew would assist with loading and preparing lines to shore. Thereafter, the tugboat would push the barge back upstream.

On July 13, 1981, the day of appellant's injury, the specific project then ongoing was the construction of the control house. The JFB–15 was moored 80 to 100 feet from the shore at the edge of the river channel. Appellant was supervising the construction of the control house when Beasley's tugboat collided with a 2,000 pound beam protruding over the edge of the JFB–15. The beam pivoted after being struck and caught appellant's left leg, causing severe injury that eventually resulted in amputation of the leg. Appellant has received Illinois worker's compensation for his injury, but brought this suit because the Jones Act would allow him to recover traditional tort damages.

## II.

Claims brought under the Jones Act have not been litigated frequently in this circuit. We take this opportunity, therefore, to review briefly the development of the law in this area and what we believe to be the relevant and controlling principles. The Jones Act, 46 U.S.C. § 688, provides in relevant part:

> Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury and in such action all statutes of the United States modifying or extending the common law of right or remedy in cases of personal injury to railroad employees shall apply....

Under this Act, the prior maritime law of the United States was modified to give seamen the rights given to railway employees under the statutes comprising the Federal Employer's Liability Act, 45 U.S.C. §§ 51–60, which provide a right of action by a railway worker for damages arising from the negligence of the owner of a railway on which the worker was employed at the time of the accident. *See Lindgren v. United States*, 281 U.S. 38, 40, 50 S.Ct. 207, 208, 74 L.Ed. 686 (1930). Applying the principles of the railway statutes, the Supreme Court early on extended coverage

under the Jones Act "to the liability of the owners of vessels for injuries to seamen extending territorially as far as Congress can make it go," *id.* at 47, 50 S.Ct. at 211, consistent with admiralty jurisdiction.[1]

Because the term "seaman" is not defined by the Jones Act, it has been left to the courts to define the compass of this term. Unfortunately, however, the case law interpreting the Jones Act has never been applied in a consistent manner. Not long after passage of the Act, the Supreme Court held that the term "seaman" was broad enough to include even longshoremen who were employed in maritime work on navigable waters, as their work was "a maritime service formerly rendered by the ship's crew." *International Stevedoring Co. v. Haverty*, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157 (1926). This decision "could have led, with the greatest of ease, to the conclusion that all maritime workers injured in the course of their employment were Jones Act seamen." G. Gilmore & C. Black, *The Law of Admiralty* § 6–21, at 330 (2d ed. 1975). The next year, however, Congress enacted the Longshoremen's and Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. §§ 901 *et seq.*, which provides for the payment of compensation to all maritime workers injured upon navigable waters, regardless of the negligence of their employers, except to an employee who is "a master or member of a crew of any vessel." Through judicial interpretation, the phrase "member of crew of any vessel" eventually became equated with the term "seaman," *see Swanson v. Marra Brothers, Inc.*, 328 U.S. 1, 7, 66 S.Ct. 869, 872, 90 L.Ed. 1045 (1946); *Senko v. LaCrosse Dredging Corp.*, 352 U.S. 370, 371, 77 S.Ct. 415, 416, 1 L.Ed.2d 404 (1957), thus making coverage under the acts mutually exclusive. The route by which the terms became equated is important because it sheds light on the ambit of Jones Act coverage.

In *South Chicago Coal & Dock Co. v. Bassett*, 309 U.S. 251, 60 S.Ct. 544, 84 L.Ed. 732 (1940), the Supreme Court was faced with the question whether an employee who worked on a vessel used for fueling steamboats and whose chief task was to facilitate the flow of coal from his vessel to the boat being fueled was a member of a crew of the vessel and thus excluded from coverage under the LHWCA. The employer argued that the question whether the employee was a member of a "crew" was a question of law. The Court, however, concluded that "the word 'crew' does not have an absolutely unvarying legal significance." *Id.* at 258, 60 S.Ct. at 548. Accordingly, the determination whether a person is a "member of the *crew*," a word that has a "wide range of variation," *id.*, is a question of fact to be left to the trier of fact. The Court did observe, however, that as used in the statute, "crew" appeared to mean "employees on the vessel who are naturally and primarily on board to aid in her navigation." *Id.* at 260, 60 S.Ct. at 549. It concluded that because the employee's duties "did not pertain to navigation, aside from the incidental task of throwing the ship's rope or making the boat fast," *id.*, and because he had no duties while the boat was in motion, his position was that of a longshoreman or other casual worker on water and thus covered by the LHWCA.

*Bassett* was relied on in another LHWCA case, *Norton v. Warner Co.*, 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931 (1944). In *Norton*, the employee worked on a barge as a boatman; his duties consisted of taking general care of the barge. In determining whether he should be excluded from coverage under the LHWCA, the Court concluded:

> If a barge without motive power of its own can have a "crew" within the meaning of the Act and if "crew" may consist of one man, we do not see why [the boatman] does not meet these requirements.... We said in the *Bassett* case

---

**1.** "The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, not-withstanding that such damage or injury be done or consummated on land." 46 U.S.C. § 740.

that the term "crew" embraced those "who are naturally and primarily on board" the vessel "to aid in her navigation." [309 U.S. at] 260 [60 S.Ct. at 549]. But navigation is not limited to "putting over the helm." It also embraces duties essential for other purposes of the vessel. Certainly members of the crew are not confined to those who can "hand, reef and steer." Judge Hough pointed out in *The Buena Ventura*, 243 F. 797, 799 [D.C.N.Y. (1916)], that "every one is entitled to the privilege of a seaman who, like seamen, at all times contributes to the labors about the operation and welfare of the ship when she is upon a voyage." And see *The Minna*, 11 F. 759 [D.C.Mich. (1882)]; *Disbrow v. Walsh Bros.*, 36 F. 607, 608 [D.C.N.Y. (1888)] (bargeman). We think that "crew" must have at least as broad a meaning under the Act....

[The boatman here] performed on the barge functions of the same quality as those performed in the maintenance and operation of many vessels. His were indeed different from the function of any other "crew" only as they were made so by the nature of the vessel and its navigational requirements.

321 U.S. at 572, 64 S.Ct. at 751 (footnote omitted).

The Supreme Court in both *Bassett* and *Norton*, however, did not explicitly equate "seaman" under the Jones Act with "member of a crew" under the LHWCA. Indeed, in *Norton* the Court observed that " '[s]eaman' as used in a particular context may of course have a broader meaning than 'crew.' " 321 U.S. at 572 n. 5, 64 S.Ct. at 751 n. 5 (citations omitted). Two years later, however, the Court took the step of equating the two terms. After reviewing the reach of the LHWCA, the Court in *Swanson v. Marra Brothers, Inc.*, 328 U.S. 1, 66 S.Ct. 869, 90 L.Ed. 1045 (1946), concluded that "[w]e must take it that the effect of these provisions of the Longshore-

men's Act is to confine the benefits of the Jones Act to the members of the crew of a vessel plying in navigable waters ...." *Id.* at 7, 66 S.Ct. at 872.[2] In commenting on *Swanson*, we stated in *Desper v. Starved Rock Ferry Co.*, 188 F.2d 177 (7th Cir.1951), *aff'd*, 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952), that:

> This decision clearly demonstrates that, since the passage of the Longshoremen's Act, the court has retreated from the position taken in the Haverty case [*International Stevedoring Co. v. Haverty*, 272 U.S. 50, 47 S.Ct. 19, 71 L.Ed. 157 (1926)] and has narrowed the Jones Act concept of "seaman" to the point where it includes only one who is a member of the crew of a vessel plying in navigable waters.

*Id.* at 180.

These general parameters were taken by the appellate courts and put into a three-prong test that has become the touchstone of Jones Act analysis. This test, as articulated in *Wilkes v. Mississippi River Sand & Gravel Co.*, 202 F.2d 383 (6th Cir.1953), states that whether a claimant under the Jones Act is a member of a crew is "primarily a question of fact" to be considered in light of three requirements: "(1) that the vessel be in navigation; (2) that there be a more or less permanent connection with the vessel; and (3) that the worker be aboard primarily to aid in navigation." *Id.* at 388; *accord McKie v. Diamond Marine Co.*, 204 F.2d 132, 136 (5th Cir.1953). *See* 1B *Benedict on Admiralty* § 11a, at 2–5 (7th ed. 1976). Because this test rests on several unexplained definitions such as "vessel in navigation" and "aid to navigation," however, it has never been applied consistently or literally. Indeed, in construing the third requirement, the *Wilkes* court itself noted that it should not be confined to those who "hand, reef and steer," but is applicable "to all whose duties contribute to the operation and welfare of the vessel," 202 F.2d at 388,

---

**2.** This view was subsequently ratified in *Senko:* "To recover [under the Jones Act] ... petitioner had to be a member of a crew, as that term is used in the Longshoremen's Act, at the time of his injury." 352 U.S. at 371, 77 S.Ct. at 416.

relying on the Supreme Court's statements in *Norton.*

The Supreme Court has never given any more precise meaning to these requirements. Although certain classes of persons, such as passengers, guests, and trespassers, are clearly excluded from coverage because the Act requires that the "seaman" be injured "in the course of his employment,"

> [w]ho else might be excluded (or included) was, as a matter of initial construction, impossible to say. After a half-century of litigation the answer to the riddle is not apparent. The Supreme Court has alternated between giving the term "seaman" an exceedingly broad construction and giving it a much narrower one. Consequently defendants have been encouraged to argue, in all but the most obvious cases, that plaintiff is not a Jones Act seaman and that the action must be dismissed. Thus there has always been, there continues to be, and presumably there will go on being a substantial amount of depressing litigation of this type.

G. Gilmore & C. Black, *supra,* at 328.

A brief review of the later Supreme Court cases demonstrates that there are few clues as to what the critical factors are in determining crew status. In *Gianfala v. Texas Co.,* 350 U.S. 879, 76 S.Ct. 141, 100 L.Ed. 775 (1955), for example, the employee was a member of a drilling crew who performed his duties aboard a submersible drilling barge. He was killed while helping to unload drilling pipe onto the barge. The trial court denied the employer's motion for a directed verdict and held that the decedent's status was a question for the jury, which went on to find for the employee. The Fifth Circuit reversed, holding that as a matter of law the decedent was not aboard primarily to aid in navigation; the appellate court stated that he was aboard ship not as a member of the ship's crew, but as a member of the drilling crew doing work done only by oil field workers. Without discussion, the Supreme Court reversed the court of appeals and remanded the case to the district court with instructions to reinstate the judgment on the jury verdict in favor of the employee.

Two years later, in *Senko v. LaCrosse Dredging Corp.,* 352 U.S. 370, 77 S.Ct. 415, 1 L.Ed.2d 404 (1957), the Court decided that there was sufficient evidence to allow the jury to decide the question whether a handyman on a dredge who was injured on shore while placing a signal lantern into a shed was a member of a crew. The handyman had been employed only a short time and had never been on the dredge when it was in transit, since it had not moved from anchorage. His duties, as recounted by the Court, required him to "clean and take care of the deck, splice rope, stow supplies, and, in general, to keep the dredge in shape." *Id.* at 372, 77 S.Ct. at 417. In finding support for the jury's finding that he was a member of the crew of the dredge, the Court took into consideration these duties "to maintain the dredge during its anchorage and for its future trips," and concluded that he "would have a significant navigation function when the dredge was put in transit." *Id.* at 374, 77 S.Ct. at 417.

The two most expansive readings of Jones Act coverage occurred in two short per curiam opinions. In *Grimes v. Raymond Concrete Pile Co.,* 356 U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737 (1958), the employee worked as a pile driver assisting in the erection of a "Texas Tower," a radar station, 110 miles out at sea. During the time the tower was being towed out to its permanent site, the employee lived on the tower and kept it in condition prior to installation. After the tower was anchored at its permanent site, he worked only at pile driving. On the day of his injury, which was six days after the tower had been anchored, he was hurt while being transported in a navy life ring from a tug to the tower. The Supreme Court reversed the First Circuit and held that a sufficient evidentiary basis existed for a jury to decide whether the employee was a member of a crew of a vessel. The minority disagreed sharply, stating that there was "no room for debate that this individual is not a

seaman, unless a 'seaman' is to mean nothing more than a person injured while working at sea." *Id.* at 255, 78 S.Ct. at 689 (Harlan, J., dissenting).

Finally, in the last case in which the Court specifically addressed this issue, *Butler v. Whiteman,* 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754 (1958), the Court held that an employee doing odd jobs around his employer's wharf might be a seaman. The employee was killed when he fell off either a barge moored to the wharf or a tug, which had been withdrawn from navigation, lashed to the barge. The Court reversed the First Circuit and remanded the case to the trial court for jury findings on three issues, including whether or not the decedent was "a seaman and member of the crew of the tug within the meaning of the Jones Act." *Id.* at 271, 78 S.Ct. at 734. Justice Harlan, again writing for the minority, stated that "it taxes imagination to the breaking point to consider this unfortunate individual to have been a seaman at the time of the accident within the meaning of the Jones Act ...." *Id.* at 272–73, 78 S.Ct. at 735 (Harlan, J., dissenting).

Diderot may very well have had the previous Supreme Court cases in mind when he wrote, "We have made a labyrinth and got lost in it. We must find our way out." In an attempt to extract some controlling principles from these cases and other relevant appellate court cases, Judge Wisdom in *Offshore Co. v. Robison,* 266 F.2d 769 (5th Cir.1959), concluded that

> there is an evidentiary basis for a Jones Act case to go to the jury: (1) if there is evidence that the injured workman was assigned permanently to a vessel (including special purpose structures not usually employed as a means of transport by water but designed to float on water) or performed a substantial part of his work on the vessel; and (2) if the capacity in

which he was employed or the duties which he performed contributed to the function of the vessel or to the accomplishment of its mission, or to the operation or welfare of the vessel in terms of its maintenance during its movement or during anchorage for its future trips.

266 F.2d at 779 (footnote omitted). The *Robison* test [3] has been accepted by many courts not only as a test of whether a case should go to the jury in a Jones Act dispute, but also as a test to be used "in delimiting the power of the factfinder to deny or confer [seaman's] status." *McDermott, Inc. v. Boudreaux,* 679 F.2d 452, 457 (5th Cir.1982). Still, some courts start with the three-prong test and do not apply the liberal construction given to all parts of that test by *Robison. See Simko v. C & C Marine Maintenance Co.,* 594 F.2d 960, 964–65 (3d Cir.1979); *Griffith v. Wheeling Pittsburgh Steel Corp.,* 521 F.2d 31, 36–38 (3d Cir.1975), *cert. denied,* 423 U.S. 1054, 96 S.Ct. 785, 46 L.Ed.2d 643 (1976).[4]

## III.

The district court in this case applied the traditional three-prong test without reference to the *Robison* reformulation of that test. It noted that the parties were in agreement that there was a material question of fact on the issue whether appellant, at the time of his injury, had a more or less permanent connection with the JFB-15. On the other two issues, the district court found that the vessel was not in navigation at the time appellant was injured, and that his duties were not primarily in aid of navigation; the court observed that appellant was employed as an ironworker and that his duties were those of an ironworker: "The fact that he did occasionally aid the deck hands in securing JFB-15 at various locations was a casual undertaking which was wholly coincidental to the

---

3. The first part of the *Robison* test synthesized then-existing case law corresponding to the first two parts of the traditional three-prong test, and the second part synthesized then-existing case law corresponding to the third part of the three-prong test.

4. The Fifth Circuit, which developed *Robison,* also sometimes quotes a hybrid version in which the first two elements of the three-prong test are addressed in conjunction with the last element of the *Robison* test. *See Bertrand v. International Mooring & Marine, Inc.,* 700 F.2d 240, 244 & n. 9 (5th Cir.1983).

achievement of the purpose for which he and his gang were employed."

Appellant contends that the district court erred in both these findings and that it should have submitted the issues to the jury. In particular, appellant objects to the district court's failure to apply the *Robison* test, under which appellant's duties aboard the JFB-15 undoubtedly contributed to its "mission," as that term was applied in *Robison* and as the cases following *Robison* have interpreted it, *see, e.g., Bennett v. Perini Corp.*, 510 F.2d 114, 116–17 (1st Cir.1975), of providing a support base for the construction of the lift section of the bridge and the control house.

Although the *Robison* formula devised by Judge Wisdom is based on a well-reasoned attempt to extract relevant principles from then-existing case law, the formula has been appropriately described as an "analytical starting point rather than a self-executing formula." *Brown v. I.T.T. Rayonier, Inc.*, 497 F.2d 234, 237 (5th Cir.1974). We think that the starting point provided by *Robison* is in most respects sound; however, we think that its restatement of the third prong of the traditional test (that the employee's duties must be primarily in aid of navigation), especially as *Robison*'s restatement has been interpreted by courts subsequently,[5] is too broad in that it accords insufficient weight to the relationship between the employee and the *transportation function* of the vessel. More specifically, we think the second part of the *Robison* test strays from important Jones Act principles when it speaks of the employee's duties as having to relate only to the "function of the vessel or the accomplishment of its mission" without further qualifying "function" and "mission" in terms of the *transportation* function and mission of the vessel. The *Robison* court's failure to qualify this requirement may have stemmed from attaching too much importance to the facts in the Supreme Court's few short per curiam opinions—*Gianfala, Grimes,* and *Butler* —and giving insuffi-

cient consideration and weight to the Supreme Court's earlier explicit statements and the thrust of its opinion in *Senko*.

Only *Gianfala, Grimes,* and *Butler,* of the Supreme Court cases, appear to be anomalous in giving insufficient attention to the employee's duties as they relate to the transportation function of the vessel (insofar as this lack of attention is revealed by the facts in those cases); all were decided without extended discussion. Other Supreme Court cases, however, emphasize the duties of the employee as they relate to the operation and welfare of the vessel *as a vessel* —as a means of transport on water. In *Senko*, for example, the Court discussed the issue fully and emphasized the navigational tasks performed by the employee. This is consistent with the Supreme Court's earlier emphasis in *Bassett* and *Norton* on duties tied to the transportation function of the vessel as essential to a finding that an employee is a member of the crew.

■ We think *Senko*'s emphasis on "significant navigational functions" and *Bassett* and *Norton*'s emphasis on activities contributing to the operation and welfare of the vessel as a means of transport on water are critical to jurisdiction under the Jones Act. Because a Jones Act "seaman" is one who is a member of a *crew of a vessel, see Senko*, 352 U.S. at 371, 77 S.Ct. at 416, and because a "vessel" under the Jones Act, while interpreted liberally, has been consistently defined as a floating structure that must have as one of its functions the *transportation* of personnel or materials across navigable waters, *see Powers v. Bethlehem Steel Corp.*, 477 F.2d 643, 647 (1st Cir.1973), we believe it is the employee's relation to the transportation function of the vessel, *i.e.*, whether the employee contributes to the maintenance, operation, or navigation of the vessel as a means of transport on water, that is critical for Jones Act purposes. Such an interpretation fulfills what we believe to be the central purpose of the Act: to provide protection for those subjected to risks associ-

---

**5.** For an example of how the failure to qualify this language leads, in our view, to an overly

broad reading of "crew" status, see *Bennett v. Perini Corp.*, 510 F.2d 114, 116–17 (1st Cir.1975).

ated with the transportation function of vessels on navigable waters.

This view is consistent with the approach the Third Circuit has taken in more narrowly construing the "primarily in aid of navigation" requirement. In *Griffith v. Wheeling Pittsburgh Steel Corp.*, 521 F.2d 31 (3d Cir.1975), for example, the court noted that the only navigational function performed by the employee was that he assisted in the throwing of lines from one barge to the other while they were being "rounded," a procedure used in moving loaded barges away from the seawall. It characterized these tasks as "insignificant" navigational functions, *id.* at 37–38, and held that these duties could not support "seaman" status.

This approach was reaffirmed in *Simko v. C & C Marine Maintenance Co.*, 594 F.2d 960 (3d Cir.1979). There, the court stated that:

> The clear import of our opinion in *Griffith* is that a maritime worker who does not actually go to sea but who is injured while performing duties on a navigable vessel must establish that he performed significant navigational functions with respect to that vessel in order to recover under the Jones Act.

*Id.* at 964–65. The court concluded that the injured employee failed to perform such functions, as his duties were limited to the cleaning and minor repairs of barges brought to his employer's facilities. *See also Lynn v. Heyl and Patterson, Inc.*, 483 F.Supp. 1247, 1250–52 (W.D.Pa.1980); *Mellon v. John F. Beasley Construction Co.*, 1981 A.M.C. 549, 555 (D.Md.1980).

No doubt one of the reasons courts originally gave a liberal interpretation to "crew" status was to cover new categories of workers such as offshore-oilmen. Indeed, in *Robison*, Judge Wisdom hinted that a broad reading of the Jones Act was necessary to give such workers, who in "many instances ... are exposed to more

hazards than are blue-water sailors," protection. 266 F.2d at 780. He observed: "They run the risk of top-heavy drilling barges collapsing. They run all the risks incident to oil drilling." *Id.* While such categories of workers previously may have fallen through the cracks of existing compensation schemes, they are now protected through the Outer Continental Shelf Lands Act, 43 U.S.C. § 1333(b), which incorporates the coverage of the LHWCA. Another obvious reason for the broad interpretations of crew member status under the Jones Act is that recoveries under the Jones Act have generally been considerably greater than those available under state workmen's compensation schemes or the LHWCA.[6] Since the 1972 amendments to the LHWCA, however, awards under the LHWCA have increased substantially, thus removing some of the equitable economic reasons for construing the Jones Act broadly.

While the liberal attitude of courts in finding employees of questionable status "seamen" may be commendable when the employee's duties fall into the gray areas, we believe the purpose of the Jones Act is distorted when persons who are obviously not seamen recover damages at the ship owner's expense. If the Jones Act is to retain any limitations on its coverage, we believe the employee's duties with respect to the transportation function of the vessel should define them. We conclude that when the person's status as a member of a crew is equivocal, "the work done by [the] employee will be crucial ...." *Braen v. Pfeifer Transportation Co.*, 361 U.S. 129, 131, 80 S.Ct. 247, 249, 4 L.Ed.2d 191 (1959). Relying on the traditional three-prong test, but emphasizing the employee's duties as they relate to the transportation function of the vessel, we hold that in these equivocal situations there is an evidentiary basis for submitting to the jury the question whether the person

---

**6.** Benefits under the LHWCA for loss of a leg (the injury suffered by appellant here), assuming only partial disability, are the lesser of 200% of the national average weekly wage or two-thirds of the employee's average weekly wage, to be paid over a period of 288 weeks. *See* 33 U.S.C. §§ 906, 908. Typical tort damages under the Jones Act, because of the generous attitude of jurors, would normally be higher than the total recovery under the LHWCA.

was a member of the crew of a vessel at the time of injury if: (1) the person injured had a more or less permanent connection with a vessel in navigation, and (2) the person injured made a significant contribution to the maintenance, operation, or welfare of the transportation function of the vessel.

Applying these guidelines to the present facts, we must conclude that while appellant's activities fall within the ambit of part 1, they fail to meet part 2. As for part 1, the district court acknowledged that the parties stipulated that there are facts suggesting that appellant had a more or less permanent connection with the JFB–15,[7] but it concluded that the JFB–15 "was not a vessel in navigation in the context of the event of plaintiff's injury." Although recognizing that in a different factual setting the JFB–15 might be considered to be a vessel in navigation, the court reasoned that at the time of injury it could not be considered so.

It was at that time a stationary platform secured to the falsework near the river bank. Its only function was that of a platform to facilitate the erection of structural steel. Although it was floating upon a navigable stream, it cannot be found to have been in navigation.

█ We believe the approach adopted by the district court was in error. The "vessel in navigation" requirement pertains not to the vessel's mobility at the precise moment of injury, but to whether it has at times been employed as a means of trans-

port on water for passengers or cargo and has not been withdrawn from navigable waters and laid up, say, for the season. The "vessel in navigation" requirement is, like the second part of our test, aimed at determining the injured party's status as a member of a "crew." Any floating structure, including those designed for special purposes, is a "vessel" capable of having a maritime "crew" so long as the structure at some time serves as a means of transport on water. "To be a vessel, the purpose and business must to some reasonable degree be the 'transportation of passengers, cargo, or equipment from place to place across navigable waters.'" *Bennett v. Perini Corp.*, 510 F.2d 114, 116 (1st Cir.1975) (quoting *Powers v. Bethlehem Steel Corp.*, 477 F.2d 643, 647 (1st Cir.), *cert. denied*, 414 U.S. 856, 99 S.Ct. 160, 38 L.Ed.2d 106 (1973)). If the waterborne structure serves no transportation function,[8] of course, it can have no group performing navigational functions, and hence no maritime "crew."[9]

█ Similarly, the injured employee does not cease becoming a member of a crew if the vessel is docked or anchored at the moment of injury.

As properly construed, the "in navigation" requirement is used in its broad sense, and is not confined strictly to the actual navigating or movement of the vessel, but instead means that the vessel is engaged as an instrument of commerce or transportation on navigable waters. [Citation omitted.] Indeed, so long

---

7. The requirement of a relatively permanent tie to the vessel is meant to deny seaman's status to those who come aboard a vessel for an isolated piece of work, not to deprive a person whose duties are truly navigational of Jones Act rights merely because he serves aboard a vessel for a relatively short period of time. *Porche v. Gulf Mississippi Marine Corp.*, 390 F.Supp. 624, 631 (E.D.La.1975).

8. About the only floating structures unable to act as a means of transport on water are offshore drilling platforms, *see, e.g., Thompson v. Crown Petroleum Corp.*, 418 F.2d 239, 240 (5th Cir.1969), and dry docks or floating docks that

are regarded as nothing more than extensions of land, *see, e.g., Cook v. Belden Concrete Products, Inc.*, 472 F.2d 999, 1001–02 (5th Cir.), *cert. denied*, 414 U.S. 868, 94 S.Ct. 175, 38 L.Ed.2d 116 (1973); *Keller v. Dravo*, 441 F.2d 1239, 1244 (5th Cir.1971), *cert. denied*, 404 U.S. 1017, 92 S.Ct. 679, 30 L.Ed.2d 665 (1972).

9. The definition of "vessel" for purposes of our test is thus inextricably intertwined with the second part of our test requiring the injured employee to have held duties connected with the transportation function of the waterborne structure.

as the vessel is upon navigable waters, an injured Jones Act seaman may recover for injuries suffered while on the wharf. [Citations omitted.]

*Griffith*, 521 F.2d at 37. So long as at the time of injury the vessel was not removed indefinitely or for the season, the employee is still considered part of its "crew," if all the other requirements are fulfilled.

In this case, the JFB–15 was clearly a "vessel in navigation." It was used to transport steel materials on the river and had not been withdrawn from the waters at the time of appellant's injury. The district court erred in granting summary judgment for Beasley on this ground.

We conclude, however, that appellant fails to meet the second part of our test. The only evidence suggesting that appellant contributed to the transportation function of the JFB–15 was the statement that he may have thrown or fastened some mooring lines. We think that this task was insignificant with respect to the operation and welfare of the transportation function of the JFB–15. *See Griffith*, 521 F.2d at 37; *Lynn*, 483 F.Supp. at 1252. The persons who were involved with the transportation function of the JFB–15, its "crew" as it were, were the operators of the work boats and tugs and the deckhands assigned to them that pushed the JFB–15 on the river. Appellant's duties were unrelated to this operation. He was an ironworker hired as a foreman charged with constructing part of the bridge. That he performed the ironwork construction on navigable waters aboard the JFB–15 does not make him a member of the crew charged with the operation and welfare of the JFB–15 as a means of transport on water.

## IV.

On these facts, there is no evidentiary basis for submitting this issue to the jury, and we accordingly affirm the decision of the district court granting Beasley's motion for summary judgment.