**ESTATE OF Mark B. RAINSFORD, et al., Plaintiffs,**

v.

**WASHINGTON ISLAND FERRY LINE, INC., et al., Defendants.**

No. 87–C–1031.

United States District Court, E.D. Wisconsin.

Oct. 31, 1988.

Roger H. Weede, deVries, Vlasak & Schallert and David W. Neeb, Davis & Kuelthau, Milwaukee, Wis., for plaintiffs.

Robert Elliott, Cook & Franke, Milwaukee, Wis., and Stephen C. Veltman, Tribler & Marwedel, Chicago, Ill., for defendants.

## DECISION AND ORDER

WARREN, Chief Judge.

Mark B. Rainsford was killed in an accident that occurred as he was performing maintenance work on a ferry owned by defendant Washington Island Ferry Line, Inc. His widow and two minor children filed suit, alleging claims for negligence and breach of warranty of seaworthiness. Jurisdiction was alleged under 28 U.S.C. § 1331 and the Jones Act, 46 U.S.C. § 688. Presently pending before the Court are cross-motions for summary judgment.

### I. Facts

The relevant facts are not in dispute. Mark B. Rainsford was hired by the Washington Island Ferry Line in September of 1983 as a deckhand and maintenance man. Prior to taking employment with the Ferry Line, Rainsford had sailed on the Great Lakes and held a license as an able-bodied seaman, although such a license was not required to be a deckhand. The Ferry Line operates a fleet of four vessels that carry automobiles and passengers year-round between the mainland of Door County, Wisconsin, and Washington Island. The four vessels are named, Voyageur, Eyrarbakki, Robert Noble, and C.G. Richter. All are customarily manned by a licensed operator and deckhand.

Once ice is sighted on the lake,[1] only the C.G. Richter, with her reinforced hull, is used. The other three ferries are taken out of service for winter repairs.

---

1. Although the parties do not refer to "the lake" with any more specificity, the Court takes judicial notice that the lake at issue is Lake Michigan.

As a deckhand, Rainsford's duties included line handling while docking and undocking; inspection of the engine room at the beginning of each trip; completing the log book; making out freight reports; calling in freight reports on the radio to the Ferry Line's office; filling out Trip Slips, which are records of each round trip; maintaining a lookout; supervising the loading and discharge of passengers, cargo and automobiles; cleaning the cabins and restrooms; hosing down the upper and lower deck; and painting, chipping and dealing with rust problems, all of which are considered traditional duties of a seaman.

During the height of the ferry season in July and August, Rainsford and the other deckhands and operators would spend the majority of their time on the vessels. During those months, little time would be spent by them on shore side maintenance. As fall approached, the proportion of time spent on the ferries, as compared to the time devoted to maintenance, would fall. By November and continuing until the spring, the time spent by Rainsford and the other deckhands would be about split between deckhand work and maintenance work.

During 1985, Rainsford spent 270 days working on board one or another of the ferries as a deckhand. During 1986, he worked as a deckhand for 201 days. In January of 1987, he served as a deckhand for 10 days in January and 13 days in February. Prior to the date of his death, March 9, 1987, he had been on vacation for more than a week at the end of February and beginning of March. He returned to work on March 4, 1987. On March 5, 6 and 7, 1987, he worked on the engines of the Eyrarbakki and was off over the weekend of March 7 and 8, 1987. Assuming a 50–week work year and a 5–day work week, Rainsford spent 83 percent of his time as a deckhand in 1985 and 80 percent as a deckhand in 1986.

Between December 3, 1986, and March 14, 1987, the Eyrarbakki was laid up for the winter. On March 9, 1987, Rainsford was performing major engine work on the vessel. This type of engine overhaul takes place approximately every six years. In order to facilitate this work, the Eyrarbakki was moored along Washington Island's south dock. The vessel was docked with her bow toward the open water of Detroit Harbor and her stern to the shore. Her port side was to the Ferry Line dock. Through the port rail of the ferry, there is an approximately 12–foot opening equipped with a portable gate. The customary method for employees to board or disembark the Eyrarbakki when she was moored at the southerly dock was to step from the deck of the vessel onto either a large truck tire fender affixed to the dock or to an angle iron that protrudes vertically from the dock next to the tire.

On March 9, 1987, there was a wind out of the north-north east of approximately 30 knots. The effect of the wind was to push the Eyrarbakki away from the dock. There was no gangway between the Eyrarbakki and the Ferry Line dock on March 9. To do the engine work on the Eyrarbakki, it was essential for Rainsford to pass back and forth across open water to get to and from the ferry.

Mark Rainsford died on March 9, 1987, apparently while performing work on the Eyrarbakki. Following Rainsford's death, the manager of the Washington Island Ferry Line, Richard P. Purinton, submitted to the United States Coast Guard a "Report of Marine Accident, Injury or Death." The following "Description of Casualty" was contained therein.

Mark was crossing from boat to dock (or the reverse) and apparently slipped, hitting his head as he fell into the water. Due to strong NNE wind that day, mooring lines were stretched, boat was 18" to 2 ft. out from the fenders on the dock, making the distance between the dock face and boat 3 to 4 ft. Although it was very windy, the harbor and moored ferry were sheltered and calm. There was no snow nor ice either on the dock or the boat. The means of crossing by stepping onto the tire or a welded channel was routine, both summer and winter. Due to exposure to lake action from the south, a gang plank is difficult if not

impossible to secure, which is why none was used. Mark was alone on board the boat that day. Other crew (employees) were aboard the winter ferry operating that day, the C.G. Richter. Only office manager Bill Schultz was ashore during the morning hours from 8:30 when the ferry departed the island dock until 11:25 when the ferry returned.

Due to ice, high winds and uncertainty of landing, I went aboard the C.G. Richter. Mark was assigned, by me, to continue readying the engine room for start-up, which he had been working on the previous week.

Mark was last seen by office manager Bill Schultz around 10–10:30 a.m. during a coffee break in the office.

At 12:20–12:25 I went below on the EYRARBAKKI to draw lube oil for a tractor. The work areas appeared normal, trouble lights were on, several tools plus Mark's thermos were on the workbench. The engine room door had been closed. Mark had completed installing throttle parts on the port Eng. as we had discussed earlier that morning. A pail of Prestone was also on the deck with a drill pump ready to fill the expansion tank. (None was spilled, nor was there any oil or oily footprints which might have indicated slippery shoe soles).

Although I was engaged in various activities and phone calls from the time I came in aboard the Richter to about 12:35 when I had lunch, employee John Gunlaugsson and I expressed concern to one another because (1) Mark did not come in for lunch (2) he was not in engine room when I had gone aboard for oil.

When Bill Schultz returned from lunch and the bank about 12:55, we learned that Mark was last seen by him about 10–10:30. We conducted a search of all ferries & engine rooms, as well as storage buildings with no success.

We did look between the boat and dock about 1:00 p.m., but glare and murky water stirred by the winds that day made it impossible to see bottom. (water depth: about 12 ft.) Still believing Mark may have either been picked up at work

by his wife, or gone home to see his mother who was ill (and had planned to go to the hospital with Mark driving her down), I asked my wife and Bob Rainsford by phone to locate his wife and try to find Mark.

We departed again on a ferry run at 1:15 p.m. with the expectation that Mark's whereabouts would be explained. By 1:30 p.m., after Mrs. Rainsford (wife) was found and Mark was still missing, the Sheriff's Department and rescue squad was notified.

About 2:30 his body was located with pike poles near the point of normal crossing between the EYRARBAKKI and the dock.

It is my opinion that unfortunate as this accident was, it took place under normal, routine conditions. Mark was an agile, careful individual, performing routine duties in a routine manner. Hazards such as the exposure or risk during boarding are difficult to eliminate; of four ferries, each has a different deck height from dock, as well as varied characteristics when moored. During maintenance, especially in winter, coveralls, work boots, and jackets are normal clothing but do occasionally confine movement. I don't believe clothing was that restrictive in Mark's case. Respectfully, Richard P. Purinton, MGR.

Although no gangway was used on March 9, there was available on the same dock a heavy steel gangway which was made for use with the Erarbakki and the other vessels of the ferry fleet. Because of its weight, the metal gangway could be put into place only with the use of a mechanical hoist which was not movable on the dock. The steel gangway could have been used if the Eyrarbakki had been moored near the hoist. In addition, there was available a set of heavy oak planks that could have been put in place between the deck of the Eyrarbakki and the dock. These oak planks, each weighing about 100 pounds, were used from time to time during the winter, when it was necessary to move heavy machinery on or off the vessel.

Following Rainsford's death, a wooden gangway was moved from the Ferry Line's dock at Gills Rock to provide a gangway to and from the Eyrarbakki at the southerly Ferry Line dock.

On May 19, 1987, a claims examiner of the United States Department of Labor, wrote to the Ferry Line stating the Department of Labor had determined that Rainsford's death came under the jurisdiction of the Longshore & Harbor Workers Compensation Act, 33 U.S.C. § 909 *et seq.*

Candis Rainsford, the widow of Mark Rainsford, filed this suit on September 2, 1987. She brought suit: (1) individually; (2) as the personal representative of the Estate of Mark B. Rainsford; and (3) as next friend and natural guardian of Christine and Andrew Rainsford, the minor children of Mark B. Rainsford and Candis Rainsford.

Washington Island Ferry Line, a Wisconsin corporation, was named as a defendant, as was St. Paul Fire & Marine Insurance Company, a foreign corporation that carried the Ferry Line's liability insurance.

## II.  Analysis

Plaintiffs and defendants both move for summary judgment on the issue of whether Mark B. Rainsford, at the time of his death, was a "seaman" within the meaning of the Jones Act. Plaintiff also moves for partial summary judgment on the issue of whether the Ferry Line's failure to provide a gangway to and from the Erarbakki made the vessel unseaworthy as a matter of law.

The Court begins with a determination of whether Rainsford was a seaman within the meaning of the Jones Act. The Jones Act provides in part:

Any seaman who shall suffer personal injury in the course of his employment may, at his election, maintain an action for damages at law, with the right of trial by jury and in such action all statutes of the United States modifying or extending the common law of right or remedy in cases of personal injury to railroad employees shall apply.

The determination of whether an injured person was a seaman is a question for the trier of fact. *Senko v. La Crosse Dredging Corporation*, 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed.2d 404 (1957). The parameters for that factual inquiry, however, have been the subject of much debate and confusion. *See* Robertson, A New Approach to Determining Seaman Status, 64 Tex.L.R. 88 (1985–86). At present, the Third, Fifth and Seventh circuits have formulated different tests. *See Lormand v. Aries Marine Corporation*, — U.S. ——, 108 S.Ct. 739, 739–40, 98 L.Ed.2d 774 (White, J., dissenting from denial of petition for writ of certiorari). The Seventh Circuit's test was developed in *Johnson v. John F. Beasley Construction Company*, 742 F.2d 1054 (1984). The appellate court held that there is an evidentiary basis for determining whether a person was a seaman at the time of injury if: (1) the person injured had a more or less permanent connection with a vessel in navigation, and (2) the person injured made a significant contribution to the maintenance, operation, or welfare of the transportation function of the vessel.[2] 742 F.2d at 1062–63.

The facts of the case at hand do not lend themselves to an easy application of the Seventh Circuit test. Several facts in particular cause this Court deep reflection. First, Rainsford had permanent connection with not just a single vessel, but with four vessels. Second, his duties as to each vessel varied almost daily, though the vast majority of his time was spent as a deckhand. Third, while three of the vessels were laid-up for the season at the time of his death, including the one he was working on, the fourth continued to make regular runs between Washington Island and the mainland of Door County.

---

**2.** The Seventh Circuit phrases the question as determinative of "whether the person was a member of the crew of the vessel at the time of his injury." 742 F.2d at 1062–63. A "seaman" under the Jones Act "is a person who is a member of a crew of a vessel." *Id.* at 1061 (citing *Senko v. LaCrosse Dredging Corp.*, 352 U.S. 370, 371, 77 S.Ct. 415, 416, 1 L.Ed.2d 404 (1957)).

If the Court were to apply the Seventh Circuit test to Rainsford's status in relation to all four vessels at the same time, the Court would easily find as a matter of law that Rainsford qualified as a seaman under the Jones Act. There is no dispute that Rainsford had a permanent connection with all four vessels and that at the time of his death, the C.G. Richter was a vessel in navigation. There also is no dispute that Rainsford made a significant contribution to the maintenance, operation, or welfare of the transportation function of the vessels through his work as a deckhand and through his work on the overhaul of the Eyrarbakki's engine.

A more difficult inquiry comes in applying the Seventh Circuit test to Rainsford's status solely in relation to the Eyrarbakki at the time of his death. Again, there would be no dispute that Rainsford had a permanent connection with the vessel. There also could be no dispute that he made a significant contribution to the maintenance, operation or welfare of the transporation function of the vessel through his work as a deckhand, which constituted the vast majority of his employment time, and through his work on the overhaul of the engine, which he was performing at the time of his death. The only question would be whether the Eyrarbakki was a vessel in navigation. The Seventh Circuit decision in *Johnson v. John F. Beasley Construction Company* explained the "vessel in navigation" requirement as follows.

> The "vessel in navigation" requirement pertains not to the vessel's mobility at the precise moment of injury, but to whether it has at times been employed as a means of transporation on water for passengers or cargo and has not been withdrawn from navigable waters and laid up, say, for the season. The "vessel in navigation" requirement is, like the second part of our test, aimed at determining the injured party's status as a member of a "crew." ... Similarly, the injured employee does not cease becoming a member of a crew if the vessel is docked or anchored at the moment of injury.

> As properly construed, the "in navigation" requirement is used in its broad sense, and is not confined strictly to the actual navigating or movement of the vessel, but instead means that the vessel is engaged as an instrument of commerce or transporation on navigable waters. [Citations omitted.] Indeed, so long as the vessel is upon navigable waters, an injured Jones Act seaman may recover for injuries suffered while on the wharf. [Citation omitted].

*Griffith [v. Wheeling Pittsburgh Steel Corporation,* 521 F.2d 31, 37 (3rd Cir. 1975) ]. So long as at the time of the injury the vessel was not removed indefinitely or for the season the employee is still considered part of its "crew," if all the other requirements are fulfilled.

742 F.2d at 1062–63. From this passage, one could certainly conclude that the Eyrarbakki was not in navigation since it is undisputed that the vessel was laid up for the winter undergoing a major engine overhaul. But also under the same passage, one could point out that the Eyrarbakki was not physically removed from navigational waters. As the Third Circuit case [*Griffith* ] relied on by the Seventh Circuit added: "Case law indicates that a vessel is 'in navigation' although moored to a pier, in a repair yard for periodic repairs, or while temporarily attached to some object." *Griffith,* 521 F.2d at 37.

■ The issue before this Court—one not addressed by the Seventh Circuit—is what effect Rainsford's multiple duties on multiple vessels should have. In *Bertrand v. International Mooring & Marine, Inc.,* 700 F.2d 240, 246 (1983), the Fifth Circuit stated as follows in considering the status of anchorhandlers who were not permenently attached to a single vessel:

... the fact that a claimant's work places him on several different vessels does not preclude seaman status[;] it is relevant in making that determination. As we stated in *Longmire [v. Sea Drilling Corp.,* 610 F.2d 1342 (5th Cir.1980) ], "[t]he issue of an injured worker's status as a seaman should be addressed with reference to the nature and location of

his occupation as a whole." *Longmire,* 610 F.2d at 1347. Consequently, the character and extent of a worker's service aboard vessels, whether it be one or several, affects the resolution of seaman status.

This Court follows this reasoning and holds that where an injured worker performed various duties on various vessels as part of his regular employment, the nature of all his work and the characteristics of each vessel are all relevant factors for a fact-finder considering whether the injured person had the status of a seaman at the time of his injuries.

■ Applying this holding to the case at hand, the Court further holds that no reasonable trier of fact could find under the undisputed facts of this case that Rainsford was not a seaman. As stated previously, there is no dispute that Rainsford's regular employment involved year-round deckhand work on a vessel in navigation. Deckhand work also was performed during all but the winter months on three other vessels in navigation. That deckhand work, which accounted for at least 80 percent of Rainsford's yearly employment time, clearly constituted a significant contribution to the maintenance, operation, or welfare of the transportation function of the four Ferry Line vessels. *See* undisputed discription of deckhand duties, pp. 719–720, *supra.* No other reasonable inference is available from the undiputed facts of this case if one is allowed to consider Rainsford's relation to all four vessels. The fact that the Eyrarbakki was laid up for the winter is simply not determinative in light of the total number of days Rainsford spent as a deckhand on the four vessels and in light of the flexible work assignments he received, including potential daily deckhand work on the C.G. Richter.[3]

Therefore, the Court finds as a matter of law that Rainsford qualifies as a seaman under the Jones Act. Summary judgment on this issue will be granted in favor of the plaintiff.

■ Plaintiffs also moved for summary judgment on the issue of the employer's duty to maintain the Eyrarbakki as a seaworthy vessel. The seaworthiness of a vessel is a warranty for fitness of duty imposed on the vessel's owner and extending to the vessel itself, its appurtenances, crew, method of cargo storage and cargo containers. *Martinez v. Sea Land Services, Inc.,* 763 F.2d 26, 27 (1st Cir.1985). " 'Seaworthiness' comprehends the owner's duty to supply his crew with a suitable ship and equipment, and this includes providing them with a suitable means to board and disembark." *Romero Reyes v. Maritime Enterprises, Inc.,* 494 F.2d 866, 869 (1st

---

3. Defendants rely heavily on the Supreme Court case of *Desper v. Starved Rock Company,* 342 U.S. 187, 72 S.Ct. 216, 96 L.Ed. 205 (1952), where the court considered the status of a person who was employed as a navigator on a ferry during the summer months and as a maintenance man for the ferry during the spring months. He was killed in the spring when a fire extinguisher exploded. At the time of the explosion, defendant's boats were blocked up on land. The Supreme Court held that decedent was not covered by the Jones Act:

The work in which the decedent was engaged at the time of his death was not that usually done by a "seaman." The boats were not afloat and had neither captain nor crew. They were undergoing seasonal repairs, the work being of the kind that, in the case of larger vessels, would customarily be done by exclusively shore-based personnel. For a number of reasons the ships might not be launched, or he might not operate one. To be sure, he was a probable navigator in the near future, but the law does not cover probable or expectant seaman, but seamen in being. It is our conclusion that while engaged in seasonal repair work, [decedent] Desper was not a "seaman" within the purview of the Jones Act. The distinct nature of the work is emphasized by the fact that there was no vessel engaged in navigation at the time of decedent's death. All had been "laid up for the winter." *Hawn v. Amercian S.S. Co.,* 107 F.2d 999, 1000 (C.A. 2d Cir.); *cf. Seneca Washed Gravel Corp. v. McManigal,* 65 F.2d 779, 780 (C.A.2d Cir.). The case at hand differs in many respects. First, Rainsford was not permanently attached to a vessel that had been laid up for the winter. His duties were subject to change on an almost daily basis, not a seasonal basis as in *Desper.* Second, not all the Ferry Line vessels had been laid up for the winter and none of the vessels had been taken out of navigable waters. Third, Rainsford was not a "probable" deckhand in the future. He was subject to deckhand work on the C.G. Richter on the day he died. His deckhand work constituted the vast majority of his regular, year-round employment.

Cir.1974). Plaintiffs argue that defendants are liable as a matter of law for failing to provide a proper gangway as part of their duty to maintain a seaworthy vessel.

■ Defendants respond that there is no warranty of seaworthiness when the vessel in question is not in navigation. Defendants center not on the "in navigation" requirement of the Jones Act, but the "in navigation" requirement for the warranty of a particular ship. As stated by Judge Learned Hand in a 1960 decision:

> It is now authoritively settled, if indeed it was ever in doubt, that, when a ship has been withdrawn from navigation and while she is being reconditioned, she does not warrant her seaworthiness to those who work aboard her until she returns to active service.... This does not mean that before she is fit her owner may not be liable to those who come aboard because of his neglect to provide for their safety; but that is quite another matter from imposing upon him the conventional wisdom of seaworthiness.

*Latus v. United States*, 277 F.2d. 264, 266 (2d Cir.).

Plaintiffs reply that the facts of the *Latus* case involved a ship that was being put back in service after four years. Plaintiffs, also in reply, cite to a series of Fifth Circuit cases that support the proposition that a vessel which temporarily leaves commerce for purposes of repairs and thereupon returns to commerce remains in navigation for the purposes of the warranty. *See* Plaintiffs' Reply Memorandum at 2–3. According to plaintiffs, the navigational status of a ship under repairs is determined by two factors: (1) whether the work is minor or major; and (2) whether the repair reflects work traditionally and ordinarily done by seamen, excluding such tasks as making major repairs requiring drydocking or special skills. *Id.* at 3 (citing *Martinez v. Dixie Carriers, Inc.*, 529 F.2d 457, 469 (5th Cir.)).

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment shall be granted if the record shows that "there is no genuine issue as to any material fact and that the moving party is

entitled to a judgment as a matter of law." *Black v. Henry Pratt Company*, 778 F.2d 1278, 1281 (7th Cir.1985). The party moving for summary judgment has the burden of establishing that there is no genuine issue of material fact. *Egger v. Phillips*, 710 F.2d 292, 296 (7th Cir.), *cert. denied*, 464 U.S. 918, 104 S.Ct. 284, 78 L.Ed.2d 262 (1983). The Court must review the entire record with all reasonable inferences drawn from it taken in a light most favorable to the nonmoving party. *Reardon v. Wroan*, 811 F.2d 1025, 1027 (7th Cir.1987).

Even assuming the standard put forth by plaintiffs for "in navigation" is appropriate—and the Court is not convinced of that assertion at present—the Court declines to grant summary judgment based on the record before it. In particular, the Court is unpersuaded that the repairs were minor. The undisputed facts establish that the Eyrarbakki was undergoing a major engine overhaul, a task performed approximately once every six year. Furthermore, plaintiff puts forth no support, factual or legal, for the proposition that the failure to provide a gangway to a ship undergoing repairs is a breach of the warranty of seaworthiness.

Therefore, the Court will deny plaintiffs' motion for partial summary judgment on the liability of defendants under the warranty of seaworthiness.

### III. Summary

Based on the decision above, the Court finds as a matter of law that at the time of his death, Mark B. Rainsford was a seaman within the meaning of the Jones Act, 46 U.S.C. § 688. Furthermore, the Court finds that summary judgment is inappropriate on the question of defendants' liability for failure to provide a gangway to the Eyrarbakki. Accordingly, the Court hereby GRANTS–IN–PART and DENIES–IN–PART plaintiffs' motion for summary judgment and hereby DENIES defendants' motion for summary judgment.

In order to schedule further proceedings, the Court will hold a pretrial/settlement conference at 9:30 a.m. on Friday, Novem-

ber 18, 1988, in Room 390, 517 East Wisconsin Avenue, Milwaukee, Wisconsin.

SO ORDERED.