## THE BARON NAPIER.

### (Circuit Court of Appeals, Fourth Circuit.  January 9, 1918.)

### No. 1558.

1. SEAMEN ⟨⟩29(5)—INJURY IN SERVICE—LIABILITY OF VESSEL—EVIDENCE.

Libelant was hired as muleteer on a British steamship transporting mules for the Allies from Newport News to Salonica. His duties had to do only with the care of the mules, and were in no way connected with the navigation of the ship, but when within two days from Salonica he was called upon by the foreman to act as watchman, and upon objecting was told that he would be imprisoned and fined if he refused. He requested a lantern, but was not given one, although other watchmen had lanterns the same night. On going in the dark upon the roof of a temporary structure built for stalls on the main deck, for air, as was customary with the watchmen, as he testified without serious contradiction, he fell through an opening over a stall, from which the removable cover had been left off, and was seriously injured. He knew of the opening, but not that it was ever left uncovered at night, and the captain of the ship testified that it was not, and that it was not on the night in question; but there was no testimony of an examination afterward to ascertain the fact. Libelant was not sent to a hospital in Greece, and received little, if any, medical attention until his return to the United States two months later, where he was discharged without any provision being made for his care. *Held*, that a finding by the trial court that libelant was injured through the negligence of those in authority on the ship, which also failed to give him proper care and attention, was fully supported by the evidence, and that under Seamen's Act March 4, 1915, c. 153, § 20, 38 Stat. 1185 (Comp. St. 1916, § 8337a), which provides that, "in any suit to recover damages for any injury sustained on board vessel or in its service, seamen having command shall not be held to be fellow servants with those under their authority," the ship was liable for the injury.

---

2. ADMIRALTY ☞118—REVIEW ON APPEAL—FINDINGS OF FACT.

   While findings by an admiralty court on questions of fact are reviewable on appeal, when made on conflicting evidence they are entitled to and are given great weight, and will not be reversed, except for plain error.

Appeal from the District Court of the United States for the Eastern District of Virginia, at Norfolk; Edmund Waddill, Jr., Judge.

Suit in admiralty by Robert Lee against the steamship Baron Napier; D. McDonald, master and claimant. Decree for libelant, and claimant appeals. Affirmed.

Leon T. Seawell, of Norfolk, Va. (Hughes, Little & Seawell, of Norfolk, Va., on the brief), for appellant.

Allan D. Jones, of Newport News. Va. (W. R. Walker, of Newport News, Va., on the brief), for appellee.

Before PRITCHARD and KNAPP, Circuit Judges, and CONNOR, District Judge.

PRITCHARD, Circuit Judge. This is a libel filed on behalf of Robert Lee against the British steamship Baron Napier in the District Court of the United States for the Eastern District of Virginia for damages for personal injuries growing out of an accident on board the steamship in December, 1916. The court below held that the injuries arose by reason of the negligence of the steamship, and assessed the damages at $1,500. The facts may be epitomized as follows:

Lee was employed by the master of the ship in November, 1916, while the ship was at Newport News, Va., destined on a voyage to Egypt. He signed as a muleteer; the ship being engaged in carrying mules to the Allies. His duties had only to do with the care of the mules, and were in no way connected with the navigation of the ship. In order that the ship might carry animals on deck, as well as between-decks, a wooden structure of a temporary nature was constructed on the forward main deck, running forward on port and starboard from the bridge to the forecastle. The width of this structure, on each side, was twelve feet; it was eight feet high, and fitted with stalls to take care of the animals. As a part of this structure, running across the ship and joining the port and starboard structure was a connecting platform about five feet wide, and eight feet above the main deck. This platform or bridge was reached by a flight of wooden steps rising from the main deck. It was in front of the steel deck, which ran athwart ship; the steel deck had a railing—"iron railing, iron stanchions and rails." There was no railing along the outer edge of this five-foot wooden platform, the same being used as a passageway by the men. On the roof of the stalls on the main deck, on the starboard side, a row of planks was laid to protect the canvass which covered the roof from the wear of the men's shoes in passing thereon. A portion of the roof of the stalls was removable, just opposite hatch No. 2. When this portion is off there is no walkway along and over the roof of the stalls.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The evidence shows that the muleteers, when serving as watchmen, were accustomed between rounds to go upon this superstructure to get fresh air. The ship, being tightly closed, was very warm, the air in the hold was foul, and it was necessary for a watchman to go out of the hold from time to time in order to keep fit for his duties. Lee testified that he went up the wooden stairway from the main deck, and, turning to his left to go upon the roof of the stalls, advanced but a step along the walkway and fell through the opening in the roof. The appellant contended that the boards had not been removed, and that Lee did not fall at the point he claims, but that he fell from the wooden passageway, which appellant's witness McIntyre stated was eight feet above the main deck and without a handrail. Appellant, in the third paragraph of his answer, contends that appellee should not have used this passageway, but should have passed along in front of the captain's cabin over a passageway on the bridge deck.

As we have stated, Lee had been employed as a muleteer, and not as a watchman, but three days from Salonica, at midday, was called upon by the foreman of the muleteers to watch that night. He was not provided with a lantern, though he asked both the foreman of the muleteers and at the engine room for one, nor was he instructed in his duties. Appellee declined to watch, but was threatened with fine and imprisonment if he did not obey. He thereupon entered upon his duties, and on the first night fell, as he contends, into an unguarded and unlighted trap, and was seriously injured. In falling, appellee struck his head, broke one or two ribs, and seriously injured his left kidney. He also asserts that he received little attention from the ship's doctor, who claimed that he was feigning, and not really injured; that he was placed in his bunk in an insanitary room with 40 men; that he was not sent to a hospital in Greece, but was brought back to the United States and discharged without any provision being made for his care.

The case was heard in the lower court upon oral and written testimony, and the District Judge held:

"That the personal injuries to the libelant, Robert Lee, alleged in the libel, arose by reason of the negligence of the steamship Baron Napier, and that said ship also negligently failed to take proper care to furnish medical attention and to take proper steps to effect his cure, and that the said libelant is entitled to recover against the steamship Baron Napier damages sustained, doth so decree, and, proceeding to assess the damages of said libelant upon the evidence heard in open court, doth assess the damages at $1,500."

Appellee, in the court below, alleged that he was entitled to have his expenses incident to his cure and care, and damages for failure of the ship to furnish medical attention. There are five assignments of error, but counsel for appellant, at the conclusion of their brief, stated their contention as to the points involved as follows:

"The libelant in this case has failed utterly to show by the weight of the evidence that his injury was caused by the negligence of any one upon the steamship. Having furnished all proper medical attention and settled all claims for wages, nothing further should be paid, and the decision of the District Court should be reversed."

The foregoing statement brings the matters in controversy within a narrow compass. Appellant bases its appeal in this instance upon the ground that the findings of fact by the court below were erroneous.

[1] The first question is as to whether "the accident was caused solely by the negligence of the appellee, for which the steamship is not responsible in damages." It was shown by the evidence of appellee that he was engaged as muleteer, for which service he was to receive the sum of $20 for the trip. He further testified that his duties as muleteer consisted of feeding and watering the animals and cleaning out the stalls, and that this service was performed in the daytime; that the ship proceeded from the point of departure and thence sailed for Salonica; that when 2½ days out of Salonica, at noon, he was ordered by the head foreman of the muleteers to turn in and rest, as he wished him to be night watchman, to take the place of a watchman who had been caught asleep the night before.

The witness McCormack was introduced by appellant, and, among other things, testified that he was "head foreman" in charge of the muleteers, "everything except the crew"; that "these men have nothing whatever to do with the navigation of the ship"; that "I signed as head foreman and am paid by the ship." Lee testified that McCormack told him that he had orders from the captain to put him on as night watchman; that he (appellee) did not want to serve as night watchman, but was ordered to do so and admonished that, if he did not serve in that capacity, he would be put in the forepeak and fined £1; that he asked McCormack for a light, and he referred him to the engineer; that he did not receive a light, nor did McCormack or any one else undertake to get him one, in order that he might safely go about his work. He also stated that two watchmen were aft and two forward; those aft being Quarles and Nelson.

The witness Quarles, among other things, testified as follows:

"I have a lantern. Lee could have got a lantern, if he wanted it. There are plenty on the ship at that time, and he could have gotten a light up there if he wanted it. I do not know whether he asked for a lantern or not. When we were down there in the Mediterranean, about two days from Salonica, I was carrying a light; but you have to blind it with a bag. I don't know about other lights forward. I had one back aft. Me and another fellow named Nelson, he had one."

Appellee stated positively that he made every effort to secure a lantern, but failed to do so, and that he had no lantern at the time he was injured. He further says:

"I had been up on that superstructure in the daytime. I worked there several days, carrying hay and carrying feed. At a point in the superstructure the diagrams show that the boards might be taken out the whole width of the superstructure, to hoist up and throw manure and trash out, and when they are loading mules they take the top off also. When I went up on the superstructure and fell, I came from the well deck up those wooden steps to the bridge over the top. I could not get on the bridge deck. I had no business there. I was watchman and ordered to stay off, and had I been found there I would have been fined £1. * * * I was on this side night watching, and there was no place for me to go but up on the superstructure to sit down. I went up the steps and on the superstructure, and on the third step I seen myself falling right on the horse stall where the cleats are. I came upon the

superstructure, where I had been accustomed to carry hay back and forth. As to why I fell, I never knew how it happened; never saw it open at night before; never knew it was open at night before. Everything was moved; there was nothing there; there was a great big hole. I had no lantern; did not have any light; if I had, I would not have fallen; * * * hot in the ship, and the night watchman told me to go up and get air; and as I was walking out on the steps on the third step I came down in the stall."

The witness McIntyre, who contradicts Lee's evidence as to how the accident occurred, among other things, said:

"I could not see whether he had a lantern or not. If he had a lantern, it was not lit."

He then proceeded to give his version as to how the accident occurred in the following language:

"I was on the Baron Napier, on her voyage in December, when the man named Robert Lee claimed that he fell. It was at night. The man standing here in the cabin is the man that claimed to have been injured. I was standing with Moore, the night foreman, and the boy, Lee, was standing out right on the superstructure running amidships, and the foreman said something to him about going in the bridge space to see about some pans that were under some mules, or something to that effect, and he started down to go to the steps, and when he started to the steps, instead of going to the steps, he stepped off the plank, off the superstructure, and went down to the edge of the hatch coamings, which is covered with hay, and then crawled out of there and sat down by No. 2 hatch; and a fellow by the name of Tom King was the night watchman at that time, and he asked him, did he hurt himself, and he said, 'Yes,' he hurt his back; and the foreman told him, if he hurt his back very bad, he had better go and turn in his quarters."

In support of appellee's contention we have his positive evidence that he fell through an opening into a stall, and that there were no mules in the stall at the time, and it is significant that appellant offered no evidence directly contradicting him on this point. It is further insisted by appellant that appellee must have visited this stall earlier in the evening, and, therefore, should have known that the roof was off. This is bare conjecture, and cannot be taken as evidence.

Appellant also insisted that it was shown by the evidence of McDonald, master of the ship, and McCormack, foreman of the muleteers, and McIntyre, that the roof was on the stall and that the walkway thereon was unbroken. McDonald, in testifying, says:

"On the night of the accident there was no part of it removed. I make an inspection—a point of seeing that all these openings, if they were used at any time, are put on before the night comes on, and I can say positively that they were on."

When being asked on cross-examination if he had any particular reason for remembering the opening was closed on the night in question, other than his general practice, this witness said that he made a careful examination every evening with a view of ascertaining whether the places were closed, as he regarded them as dangerous, and stated further that:

"I made a point of it that night, the same as any other night, to see that they were closed."

He also testified that the places were kept open at sea, but that he was positive that they were closed that night, because they were usually

closed.   Counsel for appellee insisted that at most this witness was testifying—

"as to the usual order of things; but, like most accidents, this arose because a duty was neglected, and the usual order not observed."

McCormack, among other things, testified:

"I did not make any examination of the superstructure after the accident was reported."

It further appears that he did not make any examination of Lee to ascertain the extent of his injuries, nor did he secure any medical attention, notwithstanding the fact that he admits that he learned of the accident a half hour after it occurred.

McIntyre also testified that:

"The point from which Lee fell is also a part of the wooden superstructure, and there is no rail from where he fell."

This witness further testified:

"Yes; he could have been required to be on the part of the superstructure on which I saw him before he fell.   Those horses back here would have called him."

When witness spoke of the horses "calling him," he evidently intended to convey the idea that the care of the horses required him to go to this particular point.   This witness was introduced by appellant, and according to his testimony the appellee fell from a dangerous and unguarded place, where he was required to be in the discharge of his duties.

Charles Stoval, the second cook, testified that he saw appellee at 6 o'clock the morning after the accident in his bunk, and that appellee told him how he had been hurt.   He also stated that, when McIntyre came to the kitchen on the morning after the accident to get his coffee, that witness told him about appellee being injured at which time McIntyre did not appear to have any knowledge of the accident, but rushed down to the quarters of the muleteers, saying to Stoval, "I will go right down and see him."

The witness McIntyre testified that he saw Lee fall, but that he appeared to fall from the passageway.   This corroborates the testimony of Lee to the effect that he fell from some portion of the ship.   Witness McIntyre further testified that:

"The point from which Lee fell was a part of the wooden superstructure, and there was no rail from where he fell."

This witness also testified that it was Lee's duty as watchman to be on the superstructure where he saw him just before he fell.   Under these circumstances appellee contends that, even though appellant's contention as to where he was when he fell, to wit, on an unguarded passageway over which he was required to pass in the performance of his duties, be correct, that the ship would be liable.

There is one significant point in this case, which we think should be given great weight in determining the questions involved, and that is that, when appellee started on the trip, he was healthy and strong. The appellee, in his testimony as to his condition after the accident, among other things, said:

"* * * That bone was broken on the ship; never had a accident before that; had been a strong working man. My duties as muleteer were in picking up hay and putting it on my shoulder, and carrying 100-pound sacks of bran. If you did not do it, you were logged and put in the forepeak."

This evidence clearly shows that he must have been in good physical condition, and it is but fair to assume that the ship would never have employed him to perform duties of this character, had he not been an able-bodied man. Further, the appellant failed to offer any evidence tending to show that he was not able to do the work assigned to him when he went on the ship. It also appears from the evidence of Dr. Martin, who examined appellee when the ship reached port on its return trip, about two months after the accident happened, that appellee was seriously injured. Among other things Dr. Martin said:

"I do not think a man with a rib broken as shown there, and in that condition, could have lifted hay or performed duties of a laborer."

This testimony tends to corroborate the statement of appellee, and, we think, shows conclusively that appellee must have received his injuries while engaged in work on the ship.

[2] It is a well-established rule in admiralty that the conclusions of the lower court on questions of fact will not be disturbed or reversed, unless it should clearly appear that the court had erred. In other words, great weight should be attached to the findings of fact, where there is a conflict of evidence in the court below. This court, in the case of Baker-Whiteley Coal Co. v. Neptune Navigation Co., 120 Fed. 249, 56 C. C. A. 85, said:

"We have uniformly held that, while the findings of the court on questions of fact can be reviewed in this court, the conclusion of the District Court on a conflict of evidence is entitled to and treated with great respect."

In this instance we think it is clearly established that Lee was injured while discharging a duty which he was required to perform by one who had the power to direct his movements. That he was injured cannot be doubted, when we consider all the evidence; and that his injury was, in all probability, due to the fact that he was not furnished a lantern by the use of which he could have observed any dangers incident to the duty which he was performing. If, thus employed, he fell from any portion of the ship in consequence of not being able to see his way, and was injured, we think the finding of the court below that the ship was negligent was proper.

However, it is insisted by counsel for appellant that the liability of a vessel for injuries received by a seaman depends upon the unseaworthiness of the ship, or her failure to supply and "keep in order proper appliances appurtenant thereto"; that the crew, except, perhaps, the master, are between themselves fellow servants; and that, therefore, the fellow-servant doctrine applies to such employé. In this instance the captain or the head foreman should have furnished Lee with a lantern, when they directed him to perform the duties incident to the work assigned to him; but this was not done.

Section 20 of what is known as the "Seamen's Act," enacted on

the 4th day of March, 1915, abolishes what is known as the fellow-servant doctrine by providing:

"That in any suit to recover damages for any injury sustained on board vessel in its service, seamen having command shall not be held to be fellow servants with those under their authority." Comp. St. 1916, § 8337a.

By the second assignment of error it is insisted that the court erred in holding that the steamship negligently failed to take proper care or to furnish proper medical aid to the injured man. It is contended by appellant in support of this proposition that Dr. Wimbish, the ship's physician, made a thorough examination of the appellee after his injury, and that he received the necessary and proper treatment. Dr. Wimbish, in testifying as to the extent of his examination, said:

"I did not have reason to believe there was anything wrong with his kidneys. I did not examine his urine. He did not pass any blood on board ship as far as I knew. * * * As to his rib, this enlargement I referred to, to judge by the result, it looked like it might be a tubercular drain. No, sir; I did not find the broken rib. * * * I could not say positively now whether I examined his head or not. I discovered no condition that necessitated any particular treatment. * * * I thought he was pretending to keep from working so far as that bone was concerned."

The testimony of Dr. Martin, a disinterested witness, is sufficient to convince any one that appellee did not receive proper medical treatment. Counsel for appellant strenuously insist that appellee was not telling the truth when he said that his ribs were broken on the ship, and in this connection in their brief refer to that part of Lee's testimony where he says that "I am going to tell the truth if I can." An examination of the record discloses the fact that at the time he made this statement he was being cross-examined by counsel for appellant as to the width of the horse stalls. Among other things, he said:

"As to their width, one from here to there (indicating about four feet wide). Eighteen feet tall and four feet wide, and that is the idea. I never measured it but about four feet wide. It looked to me as wide as from here to there (indicating). I cannot say; I am going to tell the truth, if I can, but I never measured it."

It clearly appears, from the testimony of this witness, that he is not educated, and his statement, while being somewhat involved, is not such as to discredit his testimony, and, further, he was talking about measurements, and his testimony could not be reasonably construed so as to apply to the injury he received to his ribs, or that he was not disposed to tell the truth. A great deal of the testimony was oral, and the learned judge who heard the case had an opportunity to observe the conduct of the witness, and under the circumstances we are convinced that his findings of fact are correct, and therefore should not be disturbed. It is manifest that the ship's physician was under the impression that appellee was not badly injured when he was called upon to attend him, and it is also clear that he was prejudiced against appellee, and this is no doubt the view that the court below took about the matter in passing upon the testimony.

As we have already said, the court below should not be reversed,

except for plain error, and the appellant has failed to convince us that the decision of the lower court was erroneous.

For the reasons stated, we are of opinion that the decree of the lower court should be affirmed.