# McDERMOTT INTERNATIONAL, INC. *v.* WILANDER

No. 89–1474.   Argued December 3, 1990—Decided February 19, 1991

O'CONNOR, J., delivered the opinion for a unanimous Court.

*James B. Doyle* argued the cause and filed briefs for petitioner.

*Jennifer Jones Bercier* argued the cause for respondent. With her on the brief was *J. B. Jones, Jr.**

JUSTICE O'CONNOR delivered the opinion of the Court.

The question in this case is whether one must aid in the navigation of a vessel in order to qualify as a "seaman" under the Jones Act, 46 U. S. C. App. § 688.

I

Jon Wilander worked for McDermott International, Inc., as a paint foreman. His duties consisted primarily of supervising the sandblasting and painting of various fixtures and piping located on oil drilling platforms in the Persian Gulf. On July 4, 1983, Wilander was inspecting a pipe on one such platform when a bolt serving as a plug in the pipe blew out under pressure, striking Wilander in the head. At the time, Wilander was assigned to the American-flag vessel M/V *Gates Tide,* a "paint boat" chartered to McDermott that contained equipment used in sandblasting and painting the platforms.

Wilander sued McDermott in the United States District Court for the Western District of Louisiana, seeking recovery under the Jones Act for McDermott's negligence related to the accident. McDermott moved for summary judgment, alleging that, as a matter of law, Wilander was not a "seaman" under the Jones Act, and therefore not entitled to recovery. The District Court denied the motion. App. 19. In a bifurcated trial, the jury first determined Wilander's status as a seaman. By special interrogatory, the jury found that Wilander was either permanently assigned to, or performed a substantial amount of work aboard, the *Gates Tide,* and that the performance of his duties contributed to the

---

*David W. Robertson* filed a brief for the Association of Trial Lawyers of America as *amicus curiae* urging affirmance.

*Richard J. Arsenault* filed a brief for the Louisiana Trial Lawyers Association as *amicus curiae.*

function of the *Gates Tide* or to the accomplishment of its mission, thereby satisfying the test for seaman status established in *Offshore Co.* v. *Robison,* 266 F. 2d 769 (CA5 1959). App. to Pet. for Cert. 16–17. The District Court denied McDermott's motion for judgment based on the jury findings. *Id.,* at 10–16.

The case then proceeded to trial on the issues of liability and damages. The jury found that McDermott's negligence was the primary cause of Wilander's injuries, but that Wilander had been 25% contributorily negligent. The jury awarded Wilander $337,500. The District Court denied McDermott's motion for judgment notwithstanding the verdict, *id.,* at 19–21, and both parties appealed.

The United States Court of Appeals for the Fifth Circuit affirmed the determination of seaman status, finding sufficient evidence to support the jury's finding under the *Robison* test. 887 F. 2d 88, 90 (1989). McDermott asked the court to reject the *Robison* requirement that a seaman "contribut[e] to the function of the vessel or to the accomplishment of its mission," *Robison, supra,* at 779, in favor of the more stringent requirement of *Johnson* v. *John F. Beasley Construction Co.,* 742 F. 2d 1054 (CA7 1984). In that case, the Court of Appeals for the Seventh Circuit—relying on cases from this Court requiring that a seaman aid in the navigation of a vessel—held that seaman status under the Jones Act may be conferred only on employees who make "a significant contribution to the maintenance, operation, or welfare of the *transportation* function of the vessel." *Id.,* at 1063 (emphasis added).

The Fifth Circuit here concluded that Wilander would not meet the requirements of the *Johnson* test, but reaffirmed the rule in *Robison* and held that Wilander was a "seaman" under the Jones Act. 887 F. 2d, at 90–91. We granted certiorari, 496 U. S. 935 (1990), to resolve the conflict between the *Robison* and *Johnson* tests on the issue of the transportation/navigation function requirement, and now affirm.

II

A

In 1903, in *The Osceola*, 189 U. S. 158, this Court summarized the state of seamen's remedies under general maritime law. Writing for the Court, Justice Brown reviewed the leading English and American authorities and declared the law settled on several propositions:

"1. That the vessel and her owners are liable, in case a seaman falls sick, or is wounded, in the service of the ship, to the extent of his maintenance and cure, and to his wages, at least so long as the voyage is continued.

"2. That the vessel and her owner are, both by English and American law, liable to an indemnity for injuries received by seamen in consequence of the unseaworthiness of the ship . . . .

"3. That all the members of the crew . . . are, as between themselves, fellow servants, and hence seamen cannot recover for injuries sustained through the negligence of another member of the crew beyond the expense of their maintenance and cure.

"4. That the seaman is not allowed to recover an indemnity for the negligence of the master, or any member of the crew . . . ." *Id.*, at 175.

*The Osceola* affirmed a seaman's general maritime right to maintenance and cure, wages, and to recover for unseaworthiness, but excluded seamen from the general maritime negligence remedy.

Congress twice attempted to overrule *The Osceola* and create a negligence action for seamen. The Seamen's Act of 1915, 38 Stat. 1164, dealt with proposition 3 of *The Osceola*, the fellow servant doctrine. Section 20 of the 1915 Act provided: "That in any suit to recover damages for any injury sustained on board vessel or in its service seamen having command shall not be held to be fellow-servants with those under their authority." 38 Stat. 1185. The change was in-

effective. Petitioner in *Chelentis* v. *Luckenbach S. S. Co.,* 247 U. S. 372 (1918), a fireman on board the steamship *J. L. Luckenbach,* attempted to recover from the ship's owner for injuries resulting from the alleged negligence of a superior officer. The Court explained that the 1915 Act was "irrelevant." *Id.,* at 384. The Act successfully established that the superior officer was not Chelentis' fellow servant, but Congress had overlooked *The Osceola*'s fourth proposition. The superior officer was no longer a fellow servant, but he was still a member of the crew. Under proposition 4, there was no recovery for negligence. 247 U. S., at 384.

Congress tried a different tack in 1920. It passed the Jones Act, which provides a cause of action in negligence for "any seaman" injured "in the course of his employment." 46 U. S. C. App. § 688. The Act thereby removes the bar to negligence articulated in *The Osceola.*

The Jones Act does not define "seaman." Neither does *The Osceola;* it simply uses the term as had other admiralty courts. We assume that the Jones Act uses "seaman" in the same way. For one thing, the Jones Act provides what *The Osceola* precludes. "The only purpose of the Jones Act was to remove the bar created by The Osceola, so that seamen would have the same rights to recover for negligence as other tort victims." G. Gilmore & C. Black, Law of Admiralty 328–329 (2d ed. 1975). See also *Warner* v. *Goltra,* 293 U. S. 155, 159 (1934). The Jones Act, responding directly to *The Osceola,* adopts without further elaboration the term used in *The Osceola.* Moreover, "seaman" is a maritime term of art. In the absence of contrary indication, we assume that when a statute uses such a term, Congress intended it to have its established meaning. See *Morissette* v. *United States,* 342 U. S. 246, 263 (1952); *Gilbert* v. *United States,* 370 U. S. 650, 658 (1962). Our first task, therefore, is to determine who was a seaman under the general maritime law when Congress passed the Jones Act.

## B

Since the first Judiciary Act, federal courts have determined who is eligible for various seamen's benefits under general maritime law. Prior to the Jones Act, these benefits included the tort remedies outlined in *The Osceola* and a lien against the ship for wages. See generally Gilmore & Black, *supra*, at 35–36, 281; *The John G. Stevens*, 170 U. S. 113, 119 (1898); *The Osceola*, *supra*, at 175. Certain early cases limited seaman status to those who aided in the navigation of the ship. The narrow rule was that a seaman—sometimes referred to as a mariner—must actually navigate: "[T]he persons engaged on board of her must have been possessed of some skill in navigation. They must have been able to 'hand, reef and steer,' the ordinary test of seamanship." *The Canton*, 5 F. Cas. 29, 30 (No. 2,388) (D Mass. 1858). See also *Gurney* v. *Crockett*, 11 F. Cas. 123, 124 (No. 5,874) (SDNY 1849).

Notwithstanding the aid in navigation doctrine, federal courts throughout the last century consistently awarded seamen's benefits to those whose work on board ship did not direct the vessel. Firemen, engineers, carpenters, and cooks all were considered seamen. See, *e. g.*, *Wilson* v. *The Ohio*, 30 F. Cas. 149 (No. 17,825) (ED Pa. 1834) (firemen); *Allen* v. *Hallet*, 1 F. Cas. 472 (No. 223) (SDNY 1849) (cook); *Sageman* v. *The Brandywine*, 21 F. Cas. 149 (No. 12,216) (D Mich. 1852) (female cook); *The Sultana*, 23 F. Cas. 379 (No. 13,602) (D Mich. 1857) (clerk). See generally M. Norris, Law of Seamen § 2.3 (4th ed. 1985); Engerrand & Bale, Seaman Status Reconsidered, 24 S. Tex. L. J. 431, 432–433 (1983).

Some courts attempted to classify these seamen under a broad conception of aid in navigation that included those who aided in navigation indirectly by supporting those responsible for moving the vessel: "[T]he services rendered must be necessary, or, at least, contribute to the preservation of the vessel, or of those whose labour and skill are employed to navi-

gate her." *Trainer* v. *The Superior*, 24 F. Cas. 130, 131 (No. 14,136) (ED Pa. 1834). This fiction worked for cooks and carpenters—who fed those who navigated and kept the ship in repair—but what of a cooper whose job it was to make barrels to aid in whaling? As early as 1832, Justice Story, sitting on circuit, held that "[a] 'cooper' is a seaman in contemplation of law, although he has peculiar duties on board of the ship." *United States* v. *Thompson*, 28 F. Cas. 102 (No. 16,492) (CC Mass.). Justice Story made no reference to navigation in declaring it established that: "A cook and steward are seamen in the sense of the maritime law, although they have peculiar duties assigned them. So a pilot, a surgeon, a ship-carpenter, and a boatswain, are deemed seamen, entitled to sue in the admiralty." *Ibid.*

By the middle of the 19th century, the leading admiralty treatise noted the wide variety of those eligible for seamen's benefits: "Masters, mates, sailors, surveyors, carpenters, coopers, stewards, cooks, cabin boys, kitchen boys, engineers, pilots, firemen, deck hands, waiters,—women as well as men,—are mariners." E. Benedict, American Admiralty § 278, p. 158 (1850). Benedict concluded that American admiralty courts did not require that seamen have a connection to navigation. "The term mariner includes all persons employed on board ships and vessels during the voyage to assist in their navigation and preservation, *or to promote the purposes of the voyage.*" *Ibid.* (emphasis added). Moreover, Benedict explained, this was the better rule; admiralty courts throughout the world had long recognized that seamen's benefits were properly extended to all those who worked on board vessels in furtherance of the myriad purposes for which ships set to sea:

> "It is universally conceded that the general principles of law must be applied to new kinds of property, as they spring into existence in the progress of society, according to their nature and incidents, and the common sense of the community. In the early periods of maritime

commerce, when the oar was the great agent of propulsion, vessels were entirely unlike those of modern times — and each nation and period has had its peculiar agents of commerce and navigation adapted to its own wants and its own waters, and the names and descriptions of ships and vessels are without number. Under the class of mariners in the armed ship are embraced the officers and privates of a little army. In the whale ship, the sealing vessel—the codfishing and herring fishing vessel—the lumber vessel—the freighting vessel—the passenger vessel—there are other functions besides these of mere navigation, and they are performed by men who know nothing of seamanship—and in the great invention of modern times, the steamboat, an entirely new set of operatives, are employed, yet at all times and in all countries, all the persons who have been necessarily or properly employed in a vessel as co-labourers to the great purpose of the voyage, have, by the law, been clothed with the legal rights of mariners—no matter what might be their sex, character, station or profession." *Id.*, § 241, pp. 133–134.

By the late 19th and early 20th centuries, federal courts abandoned the navigation test altogether, including in the class of seamen those who worked on board and maintained allegiance to the ship, but who performed more specialized functions having no relation to navigation. The crucial element in these cases was something akin to Benedict's "great purpose of the voyage." Thus, in holding that a fisherman, a chambermaid, and a waiter were all entitled to seamen's benefits, then-Judge Brown, later the author of *The Osceola*, eschewed reference to navigation: "[A]ll hands employed upon a vessel, except the master, are entitled to a [seaman's lien for wages] if their services are in furtherance of the main object of the enterprise in which she is engaged." *The Minna*, 11 F. 759, 760 (ED Mich. 1882). Judge Learned Hand rejected a navigation test explicitly in awarding sea-

men's benefits to a bartender: "As I can see in principle no reason why there should be an artificial limitation of rights to those engaged in the navigation of the ship, to the exclusion of others who equally further the purposes of her voyage, . . . I shall decide that the libelant has a lien for his wages as bartender." *The J. S. Warden*, 175 F. 314, 315 (SDNY 1910). In *Miller* v. *The Maggie P.*, 32 F. 300, 301 (ED Mo. 1887), the court explained that the rule that maritime employment must be tied to navigation had been "pronounced to be inadmissible and indecisive by later decisions." See also *The Ocean Spray*, 18 F. Cas. 558, 560–561 (No. 10,412) (D Ore. 1876) (sealers and interpreters; citing Benedict, *supra*); *The Carrier Dove*, 97 F. 111, 112 (CA1 1899) (fisherman); *United States* v. *Atlantic Transport Co.*, 188 F. 42 (CA2 1911) (horseman); *The Virginia Belle*, 204 F. 692, 693–694 (ED Va. 1913) (engineer who assisted in fishing); *The Baron Napier*, 249 F. 126 (CA4 1918) (muleteer). See generally Norris, Law of Seamen § 2.3; Engerrand & Bale, 24 S. Tex. L. J., at 434–435, and nn. 29–30. An 1883 treatise declared: "All persons employed on a vessel to assist in the main purpose of the voyage are mariners, and included under the name of seamen." M. Cohen, Admiralty 239.

We believe it settled at the time of *The Osceola* and the passage of the Jones Act that general maritime law did not require that a seaman aid in navigation. It was only necessary that a person be employed on board a vessel in furtherance of its purpose. We conclude therefore that, at the time of its passage, the Jones Act established no requirement that a seaman aid in navigation. Our voyage is not over, however.

### C

As had the lower federal courts before the Jones Act, this Court continued to construe "seaman" broadly after the Jones Act. In *International Stevedoring Co.* v. *Haverty*, 272 U. S. 50 (1926), the Court held that a stevedore is a "seaman" covered under the Act when engaged in maritime em-

ployment. Haverty was a longshore worker injured while stowing freight in the hold of a docked vessel. The Court recognized that "as the word is commonly used, stevedores are not 'seamen.'" *Id.*, at 52. "But words are flexible. . . . We cannot believe that Congress willingly would have allowed the protection to men engaged upon the same maritime duties to vary with the accident of their being employed by a stevedore rather than by the ship." *Ibid.*

Congress would, and did, however. Within six months of the decision in *Haverty*, Congress passed the Longshore and Harbor Workers' Compensation Act (LHWCA), 44 Stat. (part 2) 1424, as amended, 33 U. S. C. §§ 901–950. The Act provides recovery for injury to a broad range of land-based maritime workers, but explicitly excludes from its coverage "a master or member of a crew of any vessel." 33 U. S. C. § 902(3)(G). This Court recognized the distinction, albeit belatedly, in *Swanson* v. *Marra Brothers, Inc.*, 328 U. S. 1 (1946), concluding that the Jones Act and the LHWCA are mutually exclusive. The LHWCA provides relief for land-based maritime workers, and the Jones Act is restricted to "a master or member of a crew of any vessel": "We must take it that the effect of these provisions of the [LHWCA] is to confine the benefits of the Jones Act to the members of the crew of a vessel plying in navigable waters and to substitute for the right of recovery recognized by the *Haverty* case only such rights to compensation as are given by the [LHWCA]." *Id.*, at 7. "[M]aster or member of a crew" is a refinement of the term "seaman" in the Jones Act; it excludes from LHWCA coverage those properly covered under the Jones Act. Thus, it is odd but true that the key requirement for Jones Act coverage now appears in another statute.

With the passage of the LHWCA, Congress established a clear distinction between land-based and sea-based maritime workers. The latter, who owe their allegiance to a vessel and not solely to a land-based employer, are seamen. Ironically, on the same day that the Court decided *Swanson* it

handed down *Seas Shipping Co.* v. *Sieracki*, 328 U. S. 85 (1946). With reasoning remarkably similar to that in *Haverty*, the Court extended to a stevedore the traditional seamen's remedy of unseaworthiness in those cases where the stevedore "is doing a seaman's work and incurring a seaman's hazards." 328 U. S., at 99. It took Congress a bit longer to react this time. In 1972, Congress amended the LHWCA to bar longshore and harbor workers from recovery for breach of the duty of seaworthiness. See 86 Stat. 1263, 33 U. S. C. § 905(b); *Miles* v. *Apex Marine Corp.*, 498 U. S. 19, 28 (1990). Whether under the Jones Act or general maritime law, seamen do not include land-based workers.

The LHWCA does not change the rule that a seaman need not aid in navigation. "Member of a crew" and "seaman" are closely related terms. Indeed, the two were often used interchangeably in general maritime cases. See, *e. g., The Osceola*, 189 U. S., at 175; *The Buena Ventura*, 243 F. 797, 799 (SDNY 1916). There is nothing in these cases, or the LHWCA, to indicate that members of a crew are required to navigate. The "member of a crew" exception in the LHWCA overrules *Haverty;* "master or member of a crew" restates who a "seaman" under the Jones Act is supposed to be: a sea-based maritime employee.

## III

The source of the conflict we resolve today is this Court's inconsistent use of an aid in navigation requirement. The inconsistency arose during the 19 years that passed between the enactment of the LHWCA in 1927 and the decision in *Swanson* in 1946—19 years during which the Court did not recognize the mutual exclusivity of the LHWCA and the Jones Act. Thus, *Jamison* v. *Encarnacion*, 281 U. S. 635, 639 (1930), and *Uravic* v. *F. Jarka Co.*, 282 U. S. 234, 238 (1931), decided after passage of the LHWCA but before *Swanson*, reiterated the *Haverty* rule that stevedores are covered under the Jones Act. In *Warner* v. *Goltra*, 293

U. S. 155 (1934), the Court held that the master of a vessel is a "seaman" under the Act. In so holding, the Court relied on the salutary principle that statutory language "must be read in the light of the mischief to be corrected and the end to be attained." *Id.*, at 158. As the Jones Act is a remedial statute, there is no reason that the master of a vessel who suffers a maritime injury should be any less protected than a crew member. *Id.*, at 162. All of this was unnecessary, of course. Had the Court recognized, as it did subsequently in *Swanson*, that the LHWCA further defines Jones Act coverage, the answer was to be found in the plain language of "master or member of a crew of any vessel."

*Warner* is important for our purposes because it is the Court's first look at the term "seaman" in the Jones Act as it applies to sea-based employees. The Court adopted a definition of "seaman" consistent with that of the lower federal courts in the later pre-Jones Act cases: "[A] seaman is a mariner of any degree, who lives his life upon the sea. It is enough that what he does affects 'the operation and welfare of the ship when she is upon a voyage.' *The Buena Ventura*, 243 Fed. 797, 799, where a wireless operator was brought within the term." *Warner, supra*, at 157. There is no reference to navigation. The Court quoted *The Buena Ventura* again, specifically on the point of the expanded definition of "seaman": "'The word 'seaman' undoubtedly once meant a person who could 'hand, reef and steer,' a mariner in the true sense of the word. But as the necessities of ships increased, so the word 'seaman' enlarged its meaning." *The Buena Ventura, supra*, at 799, quoted in *Warner, supra*, at 157, n. 1. *Warner* plainly rejected an aid in navigation requirement under the Jones Act.

The confusion began with *South Chicago Coal & Dock Co.* v. *Bassett*, 309 U. S. 251 (1940). Decedent was drowned while working as a deckhand on board a lighter used to fuel steamboats and other marine equipment. His primary duty was to move coal from the boat to other vessels being fueled.

Petitioner maintained that decedent's widow was not entitled to recovery under the LHWCA because decedent was a "member of the crew" of the lighter. In holding that decedent's widow was entitled to LHWCA coverage, the Court explained that the "member of a crew" exception was meant to exclude only "those employees on the vessel who are naturally and primarily on board to aid in her navigation." *Id.*, at 260. Without defining further precisely what aiding in navigation entailed, the Court seemed to be harkening back to an earlier, discarded notion of seaman status.

But the Court was *not* defining "seaman" under the Jones Act; it was construing "member of a crew" under the LHWCA. *Bassett* was decided before *Swanson,* at a time when the Court viewed "seaman" as a broader term than "member of a crew." The *Bassett* Court stated explicitly that it did not equate "member of a crew" under the LHWCA with "seaman" under the Jones Act: "[The LHWCA], as we have seen, was to provide compensation for a class of employees at work on a vessel in navigable waters who, although they might be classed as seamen (*International Stevedoring Co.* v. *Haverty,* [272 U. S. 50 (1926)]), were still regarded as distinct from members of a 'crew.'" *Bassett, supra,* at 260. *Bassett* did not impose an aid in navigation requirement for seaman status under the Jones Act.

The Court emphasized this point a year later in a one-sentence summary reversal order in *Cantey* v. *McLain Line, Inc.,* 312 U. S. 667 (1941). *Cantey* was a Jones Act case. In ruling that claimant was not entitled to Jones Act relief, the District Court found the facts of the case indistinguishable from those of *Diomede* v. *Lowe,* 87 F. 2d 296 (CA2), cert. denied, 301 U. S. 682 (1937). *Cantey* v. *McLain Line, Inc.,* 32 F. Supp. 1023 (SDNY), aff'd, 114 F. 2d 1017 (CA2 1940). *Diomede* had held that a maritime worker was entitled to LHWCA coverage because he was not a "member of a crew." *Diomede, supra,* at 298. The District Court in *Cantey* concluded that because, following *Diomede,* claim-

ant was not a "member of a crew" under the LHWCA, he was not a "seaman" under the Jones Act. *Cantey, supra,* at 1023. The court was six years too early in recognizing the mutual exclusivity of the Jones Act and the LHWCA, and this Court consequently reversed. One of the cases cited in *Bassett* for the proposition that a "member of a crew" under the LHWCA must aid in navigation is *Diomede.* See *Bassett, supra,* at 260.

All of this should have made it clear that the aid in navigation test had no necessary connection to the Jones Act. But it did not. In *Norton* v. *Warner Co.,* 321 U. S. 565 (1944), another pre-*Swanson* case, the Court once again addressed the "member of a crew" exception to the LHWCA. Decedent lived on board a barge with no motive power and confined to waters within a 30 mile radius of Philadelphia. His duties included taking general care of the barge. The Court held that decedent was a "member of a crew."

The Court's concerns were very different in *Norton* than they had been in *Bassett.* Certain maritime unions, appearing as *amici curiae,* emphasized that the liability of an employer under the LHWCA is exclusive. This means that those covered under the LHWCA because not "members of a crew" are not entitled to the superior remedies available to seamen under the Jones Act and general maritime law. See *Norton, supra,* at 570–571. Cognizant of its obligation not to narrow unduly the class for whom Congress provided recovery under the Jones Act, the Court explained that the *Bassett* aid in navigation test was not to be read restrictively:

> "We said in the *Bassett* case that the term 'crew' embraced those 'who are naturally and primarily on board' the vessel 'to aid in her navigation.' *Id.,* p. 260. But navigation is not limited to 'putting over the helm.' It also embraces duties essential for other purposes of the vessel. Certainly members of the crew are not confined to those who can 'hand, reef and steer.' Judge Hough pointed out in *The Buena Ventura,* 243 F. 797, 799, that

'every one is entitled to the privilege of a seaman who, like seamen, at all times contributes to the labors about the operation and welfare of the ship when she is upon a voyage.' And see *The Minna*, 11 F. 759; *Disbrow* v. *Walsh Bros.*, 36 F. 607, 608 (bargeman). We think that 'crew' must have at least as broad a meaning under the Act." *Norton, supra*, at 571–572.

The Court here expressed a view very close to the *Swanson* holding that "member of a crew" under the LHWCA is the same as "seaman" under the Jones Act. *Norton* adopted a conception of "member of a crew" consistent with the established view of "seaman" in pre-Jones Act cases, and consistent with the definition of "seaman" the Court announced in *Warner*. It is a conception far broader than that announced in *Bassett*, despite *Norton*'s ostensible interpretation of that case.

With *Norton*, we again reversed course, steering back toward the *Warner* and the pre-Jones Act definition of "seaman." Unfortunately, the opinion carried with it the outmoded aid in navigation language. Of course, *Norton* was a pre-*Swanson*, pure LHWCA case.

Our Jones Act cases of the late 1950's were not. In a series of brief decisions, the Court afforded seaman status to claimants working on board vessels whose jobs had not even an indirect connection to the movement of the vessel. Despite their results, these cases either assert an aid in navigation requirement or rely on *Bassett*. See *Gianfala* v. *Texas Co.*, 350 U. S. 879 (1955) (summary reversal order) (citing *Bassett;* seaman status for a driller on board a submersible drilling barge); *Senko* v. *LaCrosse Dredging Corp.*, 352 U. S. 370, 374 (1957) (handyman on dredge anchored to shore met the aid in navigation test); *Grimes* v. *Raymond Concrete Pile Co.*, 356 U. S. 252, 253 (1958) *(per curiam)* (citing *Bassett;* pile driver on submersible radar installation); *Butler* v. *Whiteman*, 356 U. S. 271 (1958) *(per curiam)* (citing *Bassett;* handyman on tug). These decisions, to the extent that they

do not make seaman status contingent upon the seaman's job on board the vessel, are consistent with the *Warner* and pre-Jones Act definition of "seaman." And they do not conflict with the pre-*Swanson* LHWCA cases, *Bassett* and *Norton*, because those cases do not concern the Jones Act. These late 1950's Jones Act cases are befuddling, however, at least in part because they tie "seaman" under the Jones Act to "member of a crew" under the LHWCA, while ostensibly retaining the *Bassett* aid in navigation requirement.

Following *Butler*, we accepted no more of these cases, relegating to the lower courts the task of making some sense of the confusion left in our wake. Our wayward case law has led the lower courts to a "myriad of standards and lack of uniformity in administering the elements of seaman status." Engerrand & Bale, 24 S. Tex. L. J., at 494. The Seventh Circuit expressed its frustration well: "Diderot may very well have had the previous Supreme Court cases in mind when he wrote, 'We have made a labyrinth and got lost in it. We must find our way out.'" *Johnson*, 742 F. 2d, at 1060. One of the problems that this Court's Jones Act cases present to the lower courts is that the sundry jobs performed by the seamen in the cases of the late 1950's will not lie with any rational conception of aid in navigation.

## IV

We think the time has come to jettison the aid in navigation language. That language, which had long been rejected by admiralty courts under general maritime law, and by this Court in *Warner*, a Jones Act case, slipped back in through an interpretation of the LHWCA at a time when the LHWCA had nothing to do with the Jones Act.

We now recognize that the LHWCA is one of a pair of mutually exclusive remedial statutes that distinguish between land-based and sea-based maritime employees. The LHWCA restricted the definition of "seaman" in the Jones Act only to the extent that "seaman" had been taken to in-

clude land-based employees. There is no indication in the Jones Act, the LHWCA, or elsewhere, that Congress has excluded from Jones Act remedies those traditional seamen who owe allegiance to a vessel at sea, but who do not aid in navigation.

In his dissent in *Sieracki*, Chief Justice Stone chastised the Court for failing to recognize the distinct nature of land-based and sea-based employment. Traditional seamen's remedies, he explained, have been "universally recognized as . . . growing out of the status of the seaman and his peculiar relationship to the vessel, and as a feature of the maritime law compensating or offsetting the special hazards and disadvantages to which they who go down to sea in ships are subjected." 328 U. S., at 104. It is this distinction that Congress recognized in the LHWCA and the Jones Act. See *id.*, at 106; *Swanson* v. *Marra Brothers, Inc.*, 328 U. S. 1 (1946). It also explains why all those with that "peculiar relationship to the vessel" are covered under the Jones Act, regardless of the particular job they perform.

We believe the better rule is to define "master or member of a crew" under the LHWCA, and therefore "seaman" under the Jones Act, solely in terms of the employee's connection to a vessel in navigation. This rule best explains our case law and is consistent with the pre-Jones Act interpretation of "seaman" and Congress' land-based/sea-based distinction. All who work at sea in the service of a ship face those particular perils to which the protection of maritime law, statutory as well as decisional, is directed. See generally Robertson, A New Approach to Determining Seaman Status, 64 Texas L. Rev. 79 (1985). It is not the employee's particular job that is determinative, but the employee's connection to a vessel.

Shortly after *Butler*, our last decision in this area, the Court of Appeals for the Fifth Circuit attempted to decipher this Court's seaman status cases. See *Offshore Co.* v. *Robison*, 266 F. 2d 769 (1959). The Fifth Circuit correctly

determined that, regardless of its language, this Court was no longer requiring that seamen aid in navigation. *Id.*, at 776. As part of its test for seaman status, *Robison* requires that a seaman's duties "contribut[e] to the function of the vessel or to the accomplishment of its mission." *Id.*, at 779.

The key to seaman status is employment-related connection to a vessel in navigation. We are not called upon here to define this connection in all details, but we hold that a necessary element of the connection is that a seaman perform the work of a vessel. See *Maryland Casualty Co.* v. *Lawson*, 94 F. 2d 190, 192 (CA5 1938) ("There is implied a definite and permanent connection with the vessel, an obligation to forward her enterprise"), cited approvingly in *Norton*, 321 U. S., at 573. In this regard, we believe the requirement that an employee's duties must "contribut[e] to the function of the vessel or to the accomplishment of its mission" captures well an important requirement of seaman status. It is not necessary that a seaman aid in navigation or contribute to the transportation of the vessel, but a seaman must be doing the ship's work.

## V

Jon Wilander was injured while assigned to the *Gates Tide* as a paint foreman. He did not aid in the navigation or transportation of the vessel. The jury found, however, that Wilander contributed to the more general function or mission of the *Gates Tide*, and subsequently found that he was a "seaman" under the Jones Act. McDermott argues that the question should not have been given to the jury. The company contends that, as a matter of law, Wilander is not entitled to Jones Act protection because he did not aid in navigation by furthering the transportation of the *Gates Tide*.

We have said that seaman status under the Jones Act is a question of fact for the jury. · In *Bassett*, an LHWCA case, the Court held that Congress had given to the deputy commissioner, an administrative officer, the authority to determine who is a "member of a crew" under the LHWCA. 309

U. S., at 257–258. If there is evidence to support the deputy commissioner's finding, it is conclusive. *Ibid.* In *Senko*, we applied the same rule to findings by the jury in Jones Act cases. 352 U. S., at 374. "[A] jury's decision is final if it has a reasonable basis." *Ibid.* We are not asked here to reconsider this rule, but we note that the question of who is a "member of a crew," and therefore who is a "seaman," is better characterized as a mixed question of law and fact. When the underlying facts are established, and the rule of law is undisputed, the issue is whether the facts meet the statutory standard. See *Pullman-Standard* v. *Swint*, 456 U. S. 273, 289, n. 19 (1982) (defining a mixed question).

It is for the court to define the statutory standard. "Member of a crew" and "seaman" are statutory terms; their interpretation is a question of law. The jury finds the facts and, in these cases, applies the legal standard, but the court must not abdicate its duty to determine if there is a reasonable basis to support the jury's conclusion. If reasonable persons, applying the proper legal standard, could differ as to whether the employee was a "member of a crew," it is a question for the jury. See *Anderson* v. *Liberty Lobby, Inc.*, 477 U. S. 242, 250–251 (1986). In many cases, this will be true. The inquiry into seaman status is of necessity fact specific; it will depend on the nature of the vessel and the employee's precise relation to it. See *Desper* v. *Starved Rock Ferry Co.*, 342 U. S. 187, 190 (1952) ("The many cases turning upon the question whether an individual was a "seaman" demonstrate that the matter depends largely on the facts of the particular case and the activity in which he was engaged at the time of injury"). Nonetheless, summary judgment or a directed verdict is mandated where the facts and the law will reasonably support only one conclusion. *Anderson, supra,* at 248, 250–251.

The question presented here is narrow. We are not asked to determine if the jury could reasonably have found that Wilander had a sufficient connection to the *Gates Tide* to be a

"seaman" under the Jones Act. We are not even asked whether the jury reasonably found that Wilander advanced the function or mission of the *Gates Tide*. We are asked only if Wilander should be precluded from seaman status because he did not perform transportation-related functions on board the *Gates Tide*. Our answer is no. Accordingly, the judgment of the Court of Appeals is

*Affirmed.*