David CUNNINGHAM

v.

**SCHLUMBERGER WELL SERVICES, A Division of Schlumberger Technology Corp., et al.**

**Civil Action No. 96–1577.**

United States District Court,
W.D. Louisiana,
Lake Charles Division.

Sept. 26, 1996.

Jerry G. Jones, Cameron, LA, for plaintiff.

George H. Robinson, Jr., Lafayette, LA, for defendant.

## MEMORANDUM RULING

EDWIN F. HUNTER, Jr., Senior District Judge.

Before the Court is plaintiff's motion to remand to state court on the grounds that plaintiff's Jones Act allegation prohibits removal. There exists complete diversity of citizenship among all corporate defendants,[1] as well as independent federal jurisdiction under the Outer Continental Shelf Lands Act ("OCSLA"). The underlying inquiry is: Could reasonable persons, applying the proper legal standard, decide that plaintiff was a Jones Act seaman? The Supreme Court of the United States, *Chandris v. Latsis*, — U.S. ——, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995) recently defined the prerequisites for Jones Act status.

Plaintiff has filed an affidavit which describes the nature of his work, the mission of the vessels upon which he worked and his interpretation of the work history data. We quote from that affidavit:

"My name is David Cunningham. I have been directly involved and associated with offshore oil and gas exploration for almost 17 years. My specialty, among others, is production testing. At the time of my accident which resulted in the loss of my leg, I was assigned to the M/V OCEAN AMBASSADOR. This vessel is what's known as a semi-submersible drill ship. Its sole mission and purpose is to drill, test and complete oil and gas wells in deep water. A typical voyage for this vessel would be as follows: First, the vessel would be towed to a particular location in the Gulf. The anchor handlers would set various anchors which would maintain the vessel in its location to accomplish its purpose. From this point forward during the entire project or voyage, various groups· of skills or specialties are onboard at various times. First, the owner of the lease (the oil company who has chartered this vessel) will have its supervisors there for overall supervision. Secondly, the ship owner will have a group of employees who are typically those that operate the drilling equip- ment and support activities aboard the vessel, i.e. tool pusher, driller, rough neck, roustabout, welder, crane operator, etc. These employees of the shipowner are assigned bunks, fire stations, eat and live aboard the ship during their hitch (which can typically be 7 on 7 off, 14 on 14 off or some variation of that). Another group is aboard the vessel to provide the meal service and housekeeping. These are typically employees of a catering company and not employees of the shipowner. They usually work an off/on schedule similar to that of the employees of the shipowner. The next group of people who work aboard the ship in connection with its mission are specialty people who are typically hired by the lease owner to come aboard the ship, either continuously during the operation or at various intervals. Typically, in this group are people who do cementing, logging, mud, pressure testers, and those who test the well. Without this group, the vessel could not accomplish its mission. In the planning stage of the project, these various services are secured and assigned to the project. My work fell in this category. The client, the oil company, would engage Schlumberger, my employer, to perform testing of a well. We may also be assigned to do other specialties including logging, perforating, etc. I was proficient in a number of skills. Once we were assigned to this project, my time in the Houma office would be spent becoming familiar with the work to be done, assembling and testing the tools and equipment to do the job. Sometimes, I would make a pre-job inspection aboard the ship in preparation for the arrival of the equipment. When the drilling operation reached the stage where my assigned specialty was needed, I went aboard the ship and remained there until my part of the drilling operation, i.e. usually testing, was complete. My involvement in the project would not end when I left the ship as it was necessary that I return the equipment to our yard, disassemble and make the

---

1. The Louisiana citizenship of the three individuals joined as defendants are disregarded for diversity purposes inasmuch as the declarations and deposition excerpts reveal that there is no possibility that plaintiff can establish a cause of action against the individual defendants.

necessary reports to close out my part of the project.

The duration of my physical stay aboard the ship would vary depending upon the specialty, the weather, and problems which may be encountered. During my physical stay on the ship, I was assigned a bunk along with other specialties and along with the other employees of the ship owners. I ate aboard the ship with all of these people, was required to follow the ships safety rules and was assigned a specific fire station. During my work aboard the ship, I would use the equipment and tools brought aboard by me and would be assigned in my work by the employees of the ship owner. During the testing operation, this would be the primary operation taking place aboard the ship. Most non-essential tasks were interrupted during the testing. While the tool pusher was still in overall charge of the ship and while the company representative was in overall charge of the drilling operation, my crew ran the testing operation.

During the taking of my deposition, I was unable to recall details of my work during certain years. Since that time, I have been furnished with copies of the Schlumberger service orders which described the work. These service orders show that since 1992, approximately 75% of my work involved an assignment of a project aboard a jack up vessel, barge jobs or a semi-submersible job. I interpret these service orders to cover 71 projects, 39 of which were offshore on drill ships, 20 which were on either offshore or onshore drilling barges and 12 of which were either on stationary platforms or land.

At the time of my accident, I was assigned to the OCEAN AMBASSADOR and was actively pursuing the ship's work testing the well."

Documents in the record reveal that plaintiff worked randomly for many different customers on many different drilling vessels owned by many different customers. This was his first occasion to have ever been aboard the OCEAN AMBASSADOR, and his work on that rig would not have exceeded three (3) weeks. The Supreme Court of the United States granted certiorari, —— U.S. ——, 115 S.Ct. 354, 130 L.Ed.2d 309 (1994) to resolve the continuing conflict among the Courts of Appeal regarding the appropriate requirements for seaman status under the Jones Act. On June 14, 1995, the Supreme Court rendered its judgment *Chandris, Inc. v. Latsis*, —— U.S. ——, 115 S.Ct. 2172. There, the Court stated:

> "Employment-related connection to a vessel in navigation" necessary to qualify as a seaman under the Jones Act, [*McDermott Intern., Inc. v. Wilander*, 498 U.S. 337] at 355, 111 S.Ct., [807] at 817 [112 L.Ed.2d 866 (1991),] comprises two basic elements: the worker's duties must contribute to the function of the vessel or to the accomplishment of its mission, and the worker must have a connection to a vessel in navigation (or an identifiable group of vessels) that is substantial in terms of both its duration and its nature."

On the uncontested facts, there simply is no way that plaintiff can establish Jones Act criteria as articulated by the Supreme Court in *Chandris*, —— U.S. ——, ——, 115 S.Ct. 2172, 2195, 132 L.Ed.2d 314 (1995):

> "the workers' duties must have a connection to a vessel in navigation (or to an identifiable group of vessels) that is substantial in terms of both it's duration and it's nature." [2]

Mr. Cunningham's six year employment with Schlumberger, and seven days aboard the OCEAN AMBASSADOR do not equate with the possibility that he had a connection that was substantial in terms of both its duration and nature. Fifth Circuit cases involving Schlumberger personnel are in accord with this conclusion. *Langston v. Schlumberger Offshore Services, Inc.*, 809

---

**2.** We note Judge Stevens' opinion, with whom Justices Thomas and Breyer concurred, to the effect that "an employee of a ship who is injured at sea in the course of his employment is always a seaman." This view, if shared by the majority, would certainly simplify the difficulty of defining who is a "seaman". But, the majority, in rejecting Justice Stevens' view, noted that "the Jones Act was intended to protect sea based maritime workers who owe their allegiance to a vessel, and not land based employees who do not." *Chandris, supra*, at ——, 115 S.Ct. at 2194.

F.2d 1192 (1987). There, plaintiff worked on various jobs offshore for approximately one year before the accident. During that time, he was assigned to eighteen jobs on fifteen different vessels owned by ten different owners. *Id.* at 1193–94. Based upon those facts, the Fifth Circuit found that the "group of vessels Langston worked aboard simply [did] not qualify as a fleet. *Id.* at 1194.

Similarly, in *Ardleigh v. Schlumberger Ltd.*, 832 F.2d 933 (5th Cir.1987), the plaintiff, a Schlumberger engineer, worked on thirty different drilling vessels over his two year employment. His vessel work accounted for nearly 70% of his offshore time. *Id.* at 934. Rejecting the Jones Act claim on summary judgment, the Court noted the well established rule that "itinerant" oilfield workers such as Ardleigh are not Jones Act seaman. "Although such workers may spend a significant amount of time on seagoing vessels, they usually have no permanent relationship with a particular vessel or fleet of vessels." *Id.* at 934.

Cunningham cannot possibly meet the seaman status criteria. He did not have a connection to a vessel in navigation (or an identifiable group of vessels) that was substantial in terms of both its duration and nature. Like the plaintiffs in *Langston* (18 jobs, 15 vessels, 10 owners) and *Ardleigh* (40 jobs, 30 vessels, lacking common ownership) and *Lirette v. N.L. Sperry Sun, Inc.*, 831 F.2d 554 (5th Cir.1987) (4 years, 23 vessels lacking common ownership), the group of vessels that Cunningham worked aboard simply did not qualify as a fleet.

The Motion to Remand is DENIED.